1
2
3
4
5          **IN THE UNITED STATES DISTRICT COURT**

6         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

8   W.A.., a minor, By and Through his parents          CASE NO. CV F 10-1317 LJO SMS
    and guardians ad litem S.A. and J.A. and S.A.
9   and J.A. individually,

10             Plaintiffs,                    **ORDER ON CROSS-MOTIONS FOR**
                                              **SUMMARY JUDGMENT** (Docs. 43, 47)
11       vs.

12  PATTERSON JOINT UNIFIED SCHOOL
    DISTRICT, CARLI BRIONES, and DAVE
13  HODGE,

14             Defendants.
    _____/
15

16                        **INTRODUCTION**

17        Plaintiffs W.A., by and through his guardian ad litem ("Student"), and S.A. and J.A. individually

18  (collectively "Plaintiffs") appeal an education due process hearing pursuant to 20 U.S.C. §1415(i)(2)(A).

19  Plaintiffs and defendants Patterson Joint Unified School District ("District"), Carli Briones, and Dave

20  Hodge (collectively "defendants") move for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs

21  contend that the administrative law judge ("ALJ") erred on a number of issues, because the District

22  failed to comply with the Hughes Bill, California Education Code §56520 et seq., and denied Student

23  a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities in

24  Education Act, 20 U.S.C. §1400 et seq. ("IDEA"). Defendants argue that Plaintiffs fail to establish their

25  Fourth Amendment claim brought pursuant to 42 U.S.C. §1983 ("Section 1983"). In addition,

26  defendants contend that they are entitled to qualified immunity to bar Plaintiffs' Fourth Amendment

27  claim. For the reasons discussed below, this Court DENIES Student's summary judgment motion and

28  GRANTS District's summary judgment motion.

                                    1

**BACKGROUND[1]**

**Factual Background**

Student is a minor child who is eligible for special education and related services because he has autism.  Student resides within the District boundaries and would attend a District school if he attended school.  Student did not attend a District school until the 2006-2007 school year ("SY"), when District created a moderate-to-severe special day class ("SDC") for students with autism.  Student attended District schools for SYs 2006-2007 and 2007-2008.  Student has not attended a District placement since June 2008, when Student's parents removed him from a District school and began home-schooling him.

Plaintiffs allege, *inter alia*, that Student was harmed by the use of improper restraints by his teacher Carli Briones ("Ms. Briones") and his one-on-one aide Yolanda Ledezma ("Ms. Ledezma").  In addition, Plaintiffs allege that during the 2007-2008, 2008-2009, and 2009-2010 school years ("SY"), District failed to offer Student an appropriate placement, support and services, failed to conduct appropriate assessments, failed to comply with the IDEA's procedural requirements, and failed to comply with the Hughes Bill.  Plaintiffs' claims are based in part on the following:

**2007-2008:  Apricot Valley BSP and Restraints**

Student attended Apricot Valley Elementary School the first half of SY 2007-2008.  Student was placed in a severely handicapped SDC taught by Ms. Briones.  On the second day of the school year, on August 7, 2007, Student engaged in a 30-minute aggressive episode in which he followed Ms. Briones around the classroom while hitting and kicking her.  At the time, Ms. Briones was not trained in restraint techniques and Ms. Ledezma was not trained in Applied Behavioral Analysis ("ABA") techniques.  Ms. Briones and Ms. Ledezma were trained in Aggressive Response Management ("ARM") techniques.

Ms. Briones developed a  behavior support plan ("BSP") for Student on August 8, 2007, the day following the 30-minute aggressive episode.  The BSP was not approved of or provided to Student's parents.  Ms. Briones and Ms. Ledezma followed the BSP throughout the first tract of the school year and were able to de-escalate Student's behavior issues successfully thereafter.  Ms. Briones and Ms. Ledezma also received ABA technique training during this time.  Student did not have any other

---

[1] The Court takes these facts from the administrative record.  Disputed facts and facts relevant to a specific legal issue are presented and addressed below in the Discussion section.

1  behavioral outbursts during the remainder of the first tract, which ended on October 24, 2007.

2      Ms. Briones and S.A., Student's mother ("Mother") communicated daily about Student through
3  the use of a communication journal.  In this journal, Ms. Briones wrote about Student's day and Mother
4  expressed her concerns.  Mother communicated her concerns about Student's aggressive behavior at
5  home, but Ms. Briones did not observe this behavior at school with the same intensity.  Although
6  Student displayed aggression to staff and classmates on a daily basis, he was easily redirected through
7  the use of the BSP plan.

8      Mother expressed her concerns that Student did not have a behavior intervention plan ("BIP"),
9  to District's director of special education Dave Hodge ("Mr. Hodge") in an October 19, 2007 email.
10  Mother's concern was based in part on Student's aggressive behavior at home.  In addition, Mother
11  informed District that Student was going to have his medication changed, and was concerned that during
12  the medication transition period, Student would experience increased behavior issues.  Accordingly, an
13  individualized education plan ("IEP") meeting was organized for November 17, 2007.

14      Ms. Briones developed a new BSP and presented it at the November 17, 2007 IEP meeting.  The
15  IEP team, including Mother, approved the BSP.  The BSP was based on Ms. Briones' observations of
16  Student in the classroom and identified the antecedents to his behavior.  The BSP called for staff to
17  redirect Student when he became agitated.  The BSP provided for the use of restraints as a last resort to
18  de-escalate Student.  The BSP also included behavioral goals for Student.

19      The next tract began on November 27, 2007.  Ms. Briones and Ms. Ledezma began implementing
20  the new BSP.  Student's behavior did not escalate immediately at the beginning of the second tract.
21  Student's behavior did escalate upon his return to school on December 17, 2007, and resulted in the use
22  of a restraint on Student.

23      District staff again performed a restraint on Student the next day he returned to class, January
24  8, 2008, and then again for a series of days thereafter on January 9 and 10, 2008, January 15-18, 2008,
25  and January 21, 2008.  On the third day of consecutive restraints, Mr. Hodge offered to perform a
26  functional assessment analysis ("FAA") on Student.  Thereafter, Student's parents removed Student from
27  Apricot Valley, but agreed to allow District to perform the FAA.  Parents agreed to allow Student to
28  attend Ms. Briones' class on the days that Cinnamon Simpson ("Ms. Simpson") conducted the FAA.

**2007-2008: Triennial Assessment and Sierra Vista Placement**

Student was removed from District placement between January 2008 and April 2008. During this time, District conducted the FAA, and performed Student's triennial assessment, including a psycho-educational assessment. In addition, Mr. Hodge was examining possible placements for Student because of Parents' concerns that Ms. Briones could not control Student without the use of restraints.

District convened an April 4, 2008 IEP meeting. Ms. Simpson presented her FAA and BIP and Lydia Buriel ("Ms. Buriel") presented a psycho-educational assessment. Gale Norton presented information regarding Student's present levels of performance for speech and language. The IEP team discussed the proposed goals, speech and language and occupational therapy ("OT") services, and placement options.

District recommended placement at another District school, Sierra Vista. Sierra Vista is a non-public school that specializes in educating autistic children with significant behavior problems and cognitive deficits. Mother did not agree to the Sierra Vista placement until she was able to visit the site. Mother visited Sierra Vista and consented to the IEP and Sierra Vista placement on April 8, 2008.

Sierra Vista did not have a copy of Student's April 8, 2008 IEP for the first two weeks of his placement. During this time, Student was restrained twice while he was a student at Sierra Vista. Thereafter, Student was moved to a class with students who had a lower grade ability level. After the move, Student experienced no further behavior problems in class. Student did exhibit behavior issues on the school bus. One incident resulted in a three-day suspension in May 2008. After the suspension Mother removed Student from the bus and began to drive him to the school.

While at Sierra Vista, Student began attending the MIND Institute social skills group for autistic children once a week from May 2008 through September 2008. One of Student's expert witnesses, John R. Brown, Ph.D. ("Dr. Brown"), worked with Student and oversaw the social skills program at the MIND Institute. The MIND Institute created an intervention summary to improve Student's behavior.

Parents removed Student from Sierra Vista in June 2008.

**SYs 2008-2009 and 2009-2010**

Student has not attended a District placement since he was removed from Sierra Vista in June 2008. Since that time, District and Parents have been unable to agree on an appropriate placement for

1   Student and Student never returned to a District placement.  Several IEP meetings were convened, but

2   no IEP was agreed upon or approved by Mother.

3       District convened an August 26, 2008 IEP.  Mother informed District that she would not allow

4   Student to return to Sierra Vista because she believed that Student was not making academic or behavior

5   progress.  Mother also had concerns about the length of the bus ride to Sierra Vista.  Mother provided

6   the MIND Institute report a short time before the IEP meeting.  District offered the same goals and

7   services as provided in the April 2008 IEP.  District also offered either continued placement at Sierra

8   Vista or placement at Teel Middle School. Teel is an SDC designed for children with autism.  The Teel

9   SDC is a self-contained classroom adjacent to a regular education campus.  At the conclusion of the IEP

10  meeting, Mother agreed to visit Teel, but withheld consent to the IEP.  Later, Mother visited Teel, but

11  determined that it would not meet her son's needs.

12      Mother rejected District's August 26, 2008 offer in writing on September 15, 2008.  Mother

13  expressed her opinion that District failed to consider the MIND Institute reports.  Mother also concluded

14  that the goals, FAA and BIP from the April 2008 IEP did not meet Student's needs.  Mother further

15  objected to the length of the bus ride to Teel.

16      Another IEP meeting was convened on October 6, 2008 to discuss Mother's concerns about Teel.

17  Mother prepared a five-page response that detailed her objections to District's August 26, 2008 IEP, the

18  FAA and BIP, and the April 2008 goals and present levels of performance.  Mother also summarized

19  the MIND Institute reports.  At the October 2008 meeting, Mother requested that Student be placed at

20  another school, Creekside, and that District provide Student with ABA services and an ABA-trained one-

21  to-one aide.  District continued to offer Student placement at either Sierra Vista or Teel.

22      On November 10, 2008 through November 24, 2008, District provided Student with home-

23  hospital instruction.  Home instruction was later extended through January 2009.

24      The parties met on November 24, 2008 for another IEP meeting to discuss a psychological

25  evaluation prepared by Lesley J. Deprey, Ph.D. ("Dr. Deprey") and the MIND Institute reports and to

26  review placement options.  At the end of the IEP meeting, District agreed to conduct speech and

27  language and academic screenings.  District continued to offer Teel as the appropriate placement.

28  Mother continued to request placement at Creekside.

1   A December 11, 2008 IEP meeting convened to discuss Student's screenings and to revise

2   Student's goals.  District continued to offer Teel as the appropriate placement.  In addition, District

3   recommended to discontinue home instruction and to create a transition plan for Student to return to

4   school.

5   At a March 13, 2009 IEP meeting, Mother continued to demand that Student be placed at

6   Creekside with behavior supports. District presented revised goals. After discussing placement options,

7   District again offered Teel with the services and supports offered in August 2008.  District also agreed

8   to perform additional academic testing to evaluate Student's present levels of performance.

9   The parties met again at an April 29, 2009 IEP meeting, where the results of the academic testing

10  were discussed.   The parties also discussed services and placement.   The parties also discussed

11  transportation options for Student.  District raised the possibility of dedicated transportation service to

12  Teel with Student as the only passenger.  This offer was not included in the IEP.  The parties again were

13  unable to agree on proper placement for Student.

14  On July 29, 2009, Mr. Hodge sent Parents a letter detailing District's offer of services and

15  placement.  The only change from the April 29, 2009 IEP offer was regarding transportation.  District

16  offered to provide Student with dedicated transportation services.

17  **Administrative Hearing and Decision**

18  Plaintiffs filed a request for due process with the California Office of Administrative Hearings

19  ("OAH") on November 4, 2009.  This followed a request for due process filed by the District on

20  November 2, 2009.  The OAH held a hearing regarding both complaints on February 1-4, February 8-9,

21  February 16-17, and March 3, 2010.  In an April 27, 2010 decision ("ALJ Decision"), the ALJ answered

22  the following questions by way of a ruling:

23  *Student's Issues*

24  1)   During the 2007-2008 school year, after November 2, 2007, did the District deny Student a

25       FAPE because:

26       a)   The BSP of November 16, 2007 did not address Student's behavioral deficits?

27       b)   The District failed to conduct a timely FAA and develop a BIP from November 16, 2007

28            through  April  4,  2008  which  were  required  to  address  Student's  increased  non-

6

compliance, elopement, and aggression, which impeded his learning?

c) The District did not comply with the Hughes Bill requirements because it used inappropriate physical restraints and aversive interventions on Student, did not prepare BERs, did not notify parents of emergency interventions, and did not convene IEP meetings to discuss the emergency interventions, even though Student had "serious behavior problems"?

2) Did District deny Student a FAPE during SY 2007-2008, SY 2008-2009, and SY 2009-2010 by failing to conduct timely OT, pragmatic language, and inclusion assessments?

3) Did the April 4, 2008 IEP deny Student a FAPE because:

a) It did not contain appropriate reading, math, self-help, pragmatic, expressive and receptive language, fine motor, sensory integration, behavior and social skill goals to meet Student's unique needs?

b) Contained an offer of placement at a non-public school, Sierra Vista, which was not reasonably calculated to meet Student's unique needs in the least restrictive environment ("LRE")?

c) District predetermined Student's placement, which denied his parents the opportunity to participate meaningfully in the educational decision-making process?

d) District unilaterally reduced Student's speech and language OT services?

e) District failed to offer appropriate behavior support and services, including not providing Student with an appropriate FAA and BIP?

4) From April 2008 through June 2009, was Student denied a FAPE because staff at Sierra Vista did not implement Student's April 4, 2008 IEP or BIP?

5) Did the August 26, 2008 IEP deny Student a FAPE because:

a) District's offer of placement at Teel, including transportation, was not adequate to meet his unique needs in the LRE?

b) District failed to offer appropriate behavior support and services, including not providing Student with an appropriate FAA and BIP?

c) District predetermined Student's placement and failed to consider information presented

7

1    by Mother at the IEP meeting?

2 6)  Did the IEP of October 6, 2008 deny Student a FAPE because:

3    a)  District's offer of placement at Teel, including transportation, was not adequate to meet

4      his unique needs in the LRE?

5    b)  District predetermined Student's placement and limited his parents' ability to observe

6      possible placements, which denied his parents the opportunity to participate meaningfully

7      in the educational decision-making process?

8    c)  District failed to offer appropriate behavior support and services, including not providing

9      Student with an appropriate FAA and BIP?

10 7)  Did the IEPs of November 24, 2008, and December 11, 2008, deny Student a FAPE because:

11    a)  District did not propose an appropriate educational placement, which necessitated that

12      Student remain in home/hospital instruction?

13    b)  District failed to offer appropriate behavior support and services, including not providing

14      Student with an appropriate FAA and BIP?

15 8)  Did the IEP of December 11, 2008 deny Student a FAPE because:

16    a)  It did not contain appropriate reading, math, self-help, pragmatic, expressive, and

17      receptive language, fine motor, sensory integration, and social skill goals to meet

18      Student's unique needs?

19    b)  District unilaterally ceased providing Student with home/hospital instruction after his IEP

20      meeting?

21 9)  During SY 2008-2009, did the District deny Student a FAPE by failing to consider information

22    from Student's private assessors and not inviting private assessors to the IEP meetings?

23 10)  Did the IEP meeting of March 13, 2009 deny Student a FAPE because:

24    a)  District's offer of placement at Teel, including transportation, was not adequate to meet

25      his unique needs in the LRE?

26    b)  District failed to offer appropriate behavior support and services, including not providing

27      Student with an appropriate FAA and BIP?

28 11)  Did the April 29, 2009 IEP, as modified on July 29, 2009, deny Student a FAPE because:

a)     It did not contain appropriate reading, math, self-help, pragmatic, expressive, and receptive language, fine motor, sensory integration, and social skill goals to meet Student's unique needs?

b)     District's offer of placement at Teel, including transportation, was not adequate to meet his unique needs in the LRE?

c)     District brought an attorney to attend the IEP meeting of April 29, 2009, despite parents' objection to his presence, which denied parents the opportunity to participate meaningfully in the educational decision-making process?

d)     District predetermined Student's placement and limited parents' ability to observe other possible placements, which denied his parents the opportunity to participate meaningfully in the educational decision-making process?

e)     District failed to offer appropriate behavior support and services, including not providing Student with an appropriate FAA and BIP?

*District's Issues*

1)     During SY 2007-2008 through April 4, 2008, did the District provide Student with a FAPE because the District met Student's unique needs at Apricot Valley Elementary School ("Apricot Valley") and took reasonable actions to return Student to a classroom after his parents removed him from Apricot Valley?

2)     Was the IEP of April 4, 2008 reasonably calculated to provide Student with meaningful educational progress in the LRE?

3)     During SY 2008-2009, did the District provide Student with a FAPE because the District could meet Student's unique needs at Sierra Vista, and took reasonable actions to return Student to a classroom after his parents removed him from Sierra Vista?

4)     Was the IEP of October 6, 2008 reasonably calculated to provide Student with meaningful educational progress in the LRE?

5)     During SY 2009-2010, did the District provide Student with a FAPE because the District could meet Student's unique needs at Teel?

The ALJ found that Student fully prevailed on Student Issue 1(c) and District Issue 1. Student

9

1  partially prevailed on Student Issues 2, 3(a), 3(d), 4, 8(a), and 11(a) and District Issues 2, 4, and 5.

2  District prevailed fully on Student Issues 1(a), 2(b), 3(b), 3(c), 3(e), 5(a), 5(b), 5(c), 6(a), 6(b), 6(c), 7(a),

3  7(b), 8(b), 9, 10(a), 10(b), 11(b), 11(c), 11(d), and 11(e) and District Issue 3.  District partially prevailed

4  on Student Issues 2, 3(a), 3(d), 4, 8(a) and 11(a) and District Issues 2, 4, and 5.

5  **Procedural History**

6       Plaintiffs filed this appeal on July 22, 2010.  In their first cause of action, Plaintiffs assert a

7  violation of the IDEA, 20 U.S.C. §1415 against District, to appeal all of the issues on which they did not

8  prevail fully.  Plaintiffs also asserted a violation of the Americans with Disabilities Act, 42 U.S.C.

9  §12101 et seq., against District (second cause of action); a violation of Section 504 of the Rehabilitation

10  Act against District (third cause of action); and violation of Section 1983 and Fourth Amendment against

11  Ms. Briones and Mr. Hodge in their individual capacities (fourth cause of action). Plaintiffs based their

12  ADA and Section 504 claims on allegations of disability discrimination.  Plaintiffs based their Fourth

13  Amendment claim on allegations that the restraints were an illegal seizure.

14       Defendants moved to dismiss the second, third, and fourth causes of action on October 14, 2010.

15  Defendants argued that Plaintiffs failed to exhaust their administrative remedies as to their ADA, Section

16  504, and Fourth Amendment causes of action, because they did not raise the issues of disability

17  discrimination and illegal seizure in the administrative hearing.  In addition, defendants argued that

18  Plaintiffs failed to plead facts to establish a prima facie claim for their ADA, Section 504, and Fourth

19  Amendment claims.  Defendants also argued that qualified immunity barred Plaintiffs' Fourth

20  Amendment claim.  In its Motion to Dismiss Order, this Court dismissed Plaintiffs' second (ADA) and

21  third (Section 504) causes of action.  This Court denied without prejudice defendants' qualified

22  immunity argument, based on the lack of detail and lenient Fed. R. Civ. P. 12(b)(6) standards.

23       Plaintiffs appealed this Court's Motion to Dismiss Order.  Subsequently, Plaintiffs' interlocutory

24  appeal was dismissed for lack of jurisdiction, and the matter was remanded back to this Court.

25       On April 28, 2011, the parties filed cross-motions for summary judgment.  The parties filed

26  oppositions on May 31, 2011 and replies on June 17, 2011.  This Court found these motions suitable

27  for a decision without a hearing, vacated the June 27, 2011 hearing pursuant to Local Rule 230(g) and

28  issues the following order.

### PLAINTIFFS' SUMMARY JUDGMENT MOTION[2]

### Standard of Review

While called a "motion for summary judgment...the procedure is, in substance, an appeal from an administrative determination, not a summary judgment." *Capistrano Uni. Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).[3]  "When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and 'bas[es] its decision on the preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. §1415(i)(2)(B)).  Based on this standard, "complete de novo review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007).  The party seeking relief in this Court bears the burden of demonstrating that the ALJ's decision should be reversed. *Clyde K. v. Pullayup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).  In addition, the party challenging the administrative decision bears the burden of persuasion on each claim challenged.  *Id.*[4]

### Deference

In review of an IDEA due process hearing, courts give "less deference than is conventional" in review of other agency actions." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993).  "How much deference to give state educational agencies, however, is a matter for the discretion of the courts." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).  The Court, "in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After consideration, the

---

[2]This Court carefully reviewed and considered all evidence, including the administrative record, arguments, points and authorities, statements of disputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.

[3]Plaintiffs set forth and rely on traditional Fed. R. Civ. P. 56 standards of review.  Such standards are inapplicable in this IDEA appeal as explained more fully *infra*.

[4]The Individuals with Disabilities Education Act of 1997 ("IDEA") was re-authorized and amended by the Individuals with Disabilities Education Improvement Act of 2005 ("IDEIA").  The IDEIA became effective on July 1, 2005.  Accordingly, the substantive provisions of the IDEIA govern this action.  *See Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 n.1 (9th Cir. 2001).  The rules of law applicable to the IDEA are applicable under IDEIA unless otherwise noted.

1    court is free to accept or reject the findings in part or in whole." *Id.*; *Ojai*, 4 F.3d at 1472.

2        "'[D]ue weight' must be given to the administrative decision below and [] courts must not

3    'substitute their own notions of sound educational policy for those of the school authorities which they

4    review.'" *Van Duyn*, 502 F.3d at 817 (quoting *Bd. of Ed. v. Rowley*, 458 U.S. 176, 206 (1982)). "[T]he

5    amount of deference afforded the hearing officer's findings increases where they are thorough and

6    careful." *Capistrano* , 59 F.3d at 891. This Court gives deference to an ALJ's decision "when it 'evinces

7    his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity

8    to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*,

9    93 F.3d 1458, 1466 (9th Cir. 1996). The Court "treat[s] a hearing officer's findings as "'thorough and

10   careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing]

11   a complete factual background as well as a discrete analysis supporting the ultimate conclusions."*Napa*

12   *Valley*, 496 F.3d at 942-43.

13       The ALJ's 68-page decision, rendered after a nine-day hearing, contains a detailed factual

14   background and analysis. The ALJ explains his legal conclusions, including citations to the relevant

15   facts. Accordingly, this Court shall give due weight to the ALJ's decision and shall give particular

16   deference to the ALJ's decision to the extent it was "thorough and careful." Moreover, according to

17   applicable standards, this Court can "summarily dismiss...impermissible attempts to second-guess the

18   [ALJ's] characterization and weighing of the evidence." *Napa Valley*, 496 F.3d at 942.

19       While this Court thus defers to the ALJ's well-reasoned and well-supported findings and

20   conclusions, the Court independently reviews the testimony and evidence that the ALJ failed to consider

21   properly. *Napa Valley*, 496 F.3d at 943. "Because IDEA eligibility determinations are fact-intensive,"

22   the Court "reviews findings of fact for clear error, even if those findings are based on the administrative

23   record." *Id.* at 937, 943 (quoting *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877,

24   887 (9th Cir. 2001)). This Court considers the ALJ's finding of fact clearly erroneous if it "is left with

25   a definite and firm conviction that a mistake has been committed." *Id*.

26                                        **Statutory Framework**

27       "The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive

28   right to public education." *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (1992) (citing *Honig*

*v. Doe*, 484 U.S. 305, 310 (1988)).  The IDEA ensures that "all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A).  According to the IDEA, a FAPE is

> special education and services that–(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an individualized education program ("IEP"), and determine an appropriate educational placement of the student. 20 U.S.C. §1414.  More than a "simple funding statute," the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." *Honig*, 484 U.S. at 310.

Student's FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." *Rowley*, 458 U.S. at 181 (citing 20 U.S.C. §1401(18)). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19); 20 U.S.C. §1414(d); 34 C.F.R. §300.20. Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. 20 U.S.C. §§ 1414(a)(5), 1413(a)(11). In addition, "[p]arental involvement is a central feature of the IDEA." *Hoeft*, 967 F.3d at 1300.  "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free appropriate education' for each disabled child." *Id.*

1      Violations of the IDEA may arise in two situations.  First, a school district, in creating and

2  implementing the IEP, can run afoul of the Act's procedural requirements. *Rowley*, 458 U.S. 176.

3  Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably

4  calculated to enable the child to receive educational benefits.  *Id*.  Through a FAPE, "the door of public

5  education must be opened for a disabled child in a 'meaningful' way." *Id*. at 192.  District must provide

6  Student a FAPE that is "appropriately designed and implemented so as to convey" Student with a

7  "meaningful" benefit. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

8                                     **Basic Floor of Opportunity**

9      While a student's IEP must be reasonably calculated to provide him or her with educational

10  benefit, school districts are required to provide only a "basic floor of opportunity." *Rowley*, 458 U.S. at

11  200-01.  Thus, an "'appropriate' public education does not mean the absolutely best or 'potential-

12  maximizing' education for the individual child." *Gregory K.*, 811 F.2d at 1314.  However, "Congress

13  did not intend that a school system could discharge its duty under the IDEA by providing a program that

14  produces some minimal academic advancement, no matter how trivial." *Amanda J.*, 267 F. 3d at 890.

15                                       **Snapshot Evaluation**

16      The standard for evaluating IEPs, commonly called the "snapshot" rule," is not retrospective.

17  *Adams*, 195 F.3d at 1149.  As the *Adams* court explained:

18          Instead of asking whether the [IEP] was adequate in light of the [Student's] progress, the
            district court should have asked the more pertinent question of whether the [IEP] was

19          appropriately designed and implemented so as to convey [Student] with a meaningful
            benefit.  We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and

20          goal achieving methods at the time the plan was implemented and ask whether these
            methods were reasonably calculated to confer [Student] with a meaningful benefit...In

21          striving for "appropriateness," an IEP must take into account what was, and what was
            not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was

22          drafted.

23  195 F.3d at 1149. This Court considers Student's challenges to the IEPs pursuant to the snapshot

24  evaluation described in *Adams*, *supra*.

25  ///

26  ///

27  ///

28  ///

**Plaintiffs' Arguments**[5]

**1.      Whether the ALJ Erred Because District Failed to Comply with the Hughes Bill**

      **A.      Failure to Develop FAA and BIP**

Plaintiffs argue that District violated California's Hughes Bill on numerous occasions while Student was at Apricot Valley by failing to conduct an FAA resulting in a BIP in a timely manner.  When a child has a behavior issue that impedes his or her learning or that of others, an IEP team must consider, when appropriate "strategies, including positive behavioral interventions, strategies, and supports to address that behavior." 20 U.S.C. 1414(d)(3)(B)(i).  An IEP that does not address appropriately behavior that impedes a child's learning denies a student a FAPE. *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028-29 (8th Cir. 2003).

The Hughes Bill, California Education Code section 56520 *et seq*., concerns behavioral interventions for students with serious behavior problems.  Pursuant to Hughes Bill regulations, District was required to conduct an FAA, resulting in a BIP, when a student develops a "serious behavior problem," and the IEP team finds that the instructional/behavioral approaches specified in the student's IEP have been ineffective. *See* Cal. Code Regs., tit. 5, §§3001(g), 3052(b).  A "serious behavior problem" is a behavior that is self-injurious, assaultive, the cause of serious property damage, or any other behavior problem that is pervasive and maladaptive for which instructional/behavioral approaches specified in the student's IEP are found to be ineffective. Cal. Code Regs., tit. 5, §3001(ab).

A BIP is "a written document which is developed when the individual exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the individual's IEP." Cal. Code Regs., tit. 5, §§3052(a)(3), 3001(g).  Before a BIP can be written, an FAA must be conducted. *Id*. at §3052(a)(3).  Then, the BIP is based on the FAA. *Id*. at §3052(a)(3).

---

[5]Throughout Plaintiffs' 60-page opening brief, Plaintiffs: (1) improperly argue issues on which they prevailed at the administrative level; (2) fail to address issues that are identified in the section heading of their argument; and (3) improperly argue issues that were not addressed at the administrative level.  To the extent Plaintiffs prevailed on issues at the administrative level, this Court denies Plaintiffs' motion as moot.  Moreover, this Court shall only consider those issues Plaintiffs address appropriately in their brief.  The Court considers Plaintiffs' failure to address a specific issue or sub-issue as a waiver of that unaddressed issue.  In addition, this Court refuses to consider issues not raised or resolved at the administrative level, because this Court lacks subject matter jurisdiction over claims Plaintiffs failed to raise in the relevant administrative procedure. *Handberry v. Thompson*, 446 F.3d 335, 343 (2nd Cir. 2006)

1    Plaintiffs argue that the Hughes Bill required District to conduct an FAA and prepare a BIP after

2    each aggressive incident during SY 2007-2008 at Apricot Valley.  Plaintiffs argue that the District

3    should have started the FAA process at least on August 7, 2007, when Student attacked Ms. Briones for

4    30 minutes by kicking, hitting and chasing her around the room.[6]  Plaintiffs contend that the District

5    again erred in failing to perform an FAA at the November 17, 2007 IEP, based on Student's continued

6    aggressive behavior after the August 2007 incident.  Plaintiffs contend that the December 17, 2007

7    incident, in which Student was restrained for kicking and head-butting staff, again triggered District's

8    requirement to perform an FAA and develop a BIP under the Hughes Bill.  Plaintiffs argue that District

9    should have conducted an FAA and prepared a BIP each time Student was further restrained on January

10   8-10, January 15-18, and January 29, 2008.

11   The ALJ ruled that the District was "not on notice" until January 2008 that it needed to conduct

12   an FAA.  As to the August 7, 2007 incident and the November 16, 2007 IEP, the ALJ ruled that "the

13   District was not on notice...that it needed to conduct an FAA because Student had not experienced

14   sufficient serious behavior problems."  ALJ Decision, p. 50.  This conclusion was based on a number

15   of factual findings, including: "The only serious [behavioral] incident was the incident on August 7,

16   2007.  After that incident...Ms. Briones was able to easily manage Student's behavior and easily redirect

17   him if he attempted to hit staff or other Students." *Id*.  The ALJ further found that the August 8, 2007

18   BSP that Ms. Briones prepared and implemented during that time was "properly drafted...based on the

19   Student's behavioral problems, which were not serious, using the strategies that had been effective in

20   her class." *Id*.  Thus, the ALJ concluded that as of the November 2007 IEP, District did not need to

21   conduct an FAA and develop a BIP because Student was not exhibiting serious behavioral problems,

22   and the BSP Ms. Briones drafted was adequate to address Student's behavioral problems. *Id*.  The ALJ

23   further concluded that December 17, 2007 incident "did not require the District to conduct an FAA, as

24   this incident appeared to be an aberration.  It was the first incident after school resumed on November

25   27, 2007, in which the District needed to restrain Student." *Id*. at p. 51.

26

27   [6]Plaintiffs' arguments related to the August 7, 2007 incident are barred by the statute of limitations.  The two-year
statute of limitations in this case bars argument relying on events that took place prior to November 2, 2007. See ALJ

28   Decision, p. 2 n. 4; 20 U.S.C. §1415(f)(3)(D).

16

1    The ALJ found that District was on notice that it needed to conduct an FAA in January 2008

2    "because of Student's increasing behavior outbursts, which caused the District to physically restrain him

3    nearly every day until his Parents removed him from Ms. Briones's SDC." ALJ Decision, p. 51.  Based

4    on the increasing behavior in early January 2008, the ALJ found that the District's offer to perform an

5    FAA on January 10, 2008 was timely. *Id*.

6    Student has failed to establish that the ALJ erred in concluding that District was not on notice

7    at the November 17, 2007 IEP meeting that Student required the development of an FAA and BIP.

8    Under the Hughes Bill, District was required to conduct an FAA when both: (1) Student develops a

9    "serious behavior problem" and (2) the IEP team finds that the instructional/behavioral approaches

10   specified in the student's IEP have been ineffective.  A "serious behavior problem" is a behavior that

11   is self-injurious, assaultive, the cause of serious property damage, or any other behavior problem that

12   is pervasive and maladaptive for which instructional/behavioral approaches specified in the student's

13   IEP are found to be ineffective. Cal. Code Regs., tit. 5, §3001(ab).  The evidence supports the ALJ's

14   findings that after the August 7, 2007 incident, Student had no further behavioral outbursts during the

15   remainder of the first tract, which ended on October 24, 2007.  Although Student displayed aggression

16   towards other students and staff during this time period, the behavioral approaches were effective, and

17   Student was easily redirected. Ms. Briones created a BSP for the November 16, 2007 IEP meeting based

18   on her observations of Student.  Based on a snapshot evaluation, it appeared that the BSP developed by

19   Ms. Briones would be effective to redirect Student's behavior issues.  Accordingly, the ALJ did not err

20   to conclude that District was not required to develop an FAA at the November 16, 2007 IEP.

21   Accordingly, Student's motion as to this issue is denied.

22   Similarly, the evidence supports the ALJ's conclusion that District was on notice in January 2008

23   that an FAA was required and that District's offer to conduct an FAA on January 10, 2008 was timely.

24   The next tract began on November 27, 2007.  Ms. Briones instructed Ms. Ledezma on the BSP and they

25   implemented it without incident initially.  Student was absent between December 4-11, 2007.  On

26   December 17, 2007, Student's aggressive behavior began to escalate, leading to a restraint.  The ALJ

27   reasonably concluded that this episode could have been considered an aberration, considering that

28   Student had not had a significant behavior episode since August 7, 2007.  After the December 17, 2007

episode, Student did not return to school until after the winter break ended on January 7, 2008. Student's behavior continued to escalate upon his return, and restraints occurred on January 8-10, January 15-18, 2008. During this time, on January 10, 2008, District offered to perform an FAA. Thus, the offer to perform the FAA was made shortly after the two conditions precedent were satisfied; to wit, after Student displayed serious behavior problems and it became apparent that the BSP was not effective. The second condition was satisfied after Ms. Briones and Ms. Ledezma were unable to use the BSP effectively to de-escalate Student's behavior after four days of it being ineffective. Based on these facts, Student fails to establish that the ALJ erred to conclude that the January 10, 2008 offer of an FAA violated the Hughes Bill or denied Student a FAPE.

### B.    Failure to Conduct BERs and Emergency IEPs

Plaintiffs argue extensively that District violated the Hughes Bill for failure to complete a behavior emergency report ("BER") after each emergency intervention performed in December 2007 and January 2008. When, as here, an FAA is not in place, District is required under the Hughes Act to conduct a BER and schedule an emergency IEP. District failed to do so, despite its obligations, each time a restraint was used in December 2007 and January 2008.

Plaintiffs prevailed on this issue in the ALJ Decision. Specifically, the ALJ ruled:

> Regarding the December 17, 2007, and January 2008 incidents, the District needed to complete the BER...and needed to hold an emergency IEP meeting....Therefore, the District denied Parents a meaningful opportunity to participate in Student's educational decision-making process, especially due to Mother's concerns about Student's increased aggressive behaviors and her desire for the District to address the issue.

ALJ Decision, p. 51. District does not appeal this adverse ruling. Accordingly, Plaintiffs' arguments on this issue are denied as moot.

In Plaintiffs' revised reply, Plaintiffs explain that District's failure to conduct BERs and emergency IEPs demonstrate District's egregious behavior in also failing to conduct an FAA in a timely manner. While the Court notes Plaintiffs' position, as discussed more fully above, Plaintiffs failed to establish that the ALJ erred to conclude that District's January 10, 2008 offer to conduct an FAA was untimely.

///

///

18

2.     **Whether the ALJ Erred Because District Failed to Provide a BSP and Appropriate Support and Services at the November 16, 2007 IEP**

A.     **Whether the BSP Developed by District Was Appropriate**

The ALJ found that the BSP adopted at the November 17, 2007 IEP was appropriate to meet Student's educational needs.  The ALJ's conclusion was based, *inter alia*, on the following findings of fact:

> Ms. Brionnes[7] created a BSP for the November 16, 2007 meeting based on her observations of Student.  Ms. Brionnes did not collect formal data because Student had not demonstrated significant behavioral problems other than the August 7, 2007 incident. Ms. Brionnes appropriately designed the BSP to address Student's behavioral problems that she observed in the classroom based on the antecedent of Student's behavior and the consequences of his conduct. Ms. Brionnes observed that Student would begin to act out and become aggressive when he did not receive attention he wanted, or was required to perform a non-preferred task.  The BSP called for staff to redirect Student when he became agitated by giving him breaks or having him perform another activity.  Staff also worked with Student to teach him to ask for breaks to calm down when he felt agitated, and rewarded him for staying on-task. Staff would use verbal prompts to remind Student that he was working for a reward if he stayed on-task.  The BSP provided that if staff could not calm Student through verbal prompts and escorting him outside of the classroom, staff would use District-approved physical restraints only as a last resort to protect Student or others.

> The BSP also included behavioral goals to address Student's aggressive behaviors to reduce these to three or less a week, rather than once or twice a day.  Another goal was for Student to ask for breaks or to work on another activity.  The District proposed that Student meet these behavioral goals by February 2008.  Mother agreed to the District's BSP, and did not express any concerns that the BSP did not properly address Student's aggressive behaviors in class.

> The BSP was appropriate to meet Student's unique behavioral needs as the BSP incorporated strategies that had been effective in Ms. Brionnes's class.

ALJ Decision, pp. 10-11.

Plaintiffs continue to argue that an FAA was required.  This Court has ruled on these arguments in the previous section.  Plaintiffs further fault the District for events that occurred outside of the limitations period.  This Court shall not consider these irrelevant arguments.

Plaintiffs challenge District's BSP policy. Plaintiffs argue that District's policy is contrary to law

---

[7] Ms. Briones' maiden name was Garzelli, and she is referred to as "Ms. Garzelli" or "Ms. G."in IEPs and other documents related to the time when Student was in her class.  The ALJ spelled Briones as Brionnes throughout the ALJ Decision.

1   and led to an inappropriate BSP for Student.  Plaintiffs explain the District policy as follows: According

2   to Mr. Hodge, when behaviors occur, the classroom teacher first modifies their existing BSP once or

3   twice.  Then a BSP is "usually" written.  The BSP is allowed to run for six weeks.  If the BSP is not

4   working after six weeks, then arrangements are made for an FAA.

5            Plaintiffs fail to establish that the ALJ erred to find that the BSP presented by Ms. Briones and

6   approved at the November 17, 2007 IEP provided Student with a FAPE.  As set forth above, this Court

7   considers a snapshot evaluation when considering whether the IEP was appropriate for Student and asks

8   whether the BSP was calculated to provide Student with a meaningful educational benefit.  Plaintiffs'

9   attack on the District policy does not establish that the BSP presented and adopted at the November 17,

10  2007 IEP failed to provide Student with a FAPE.  The BSP was developed by Ms. Briones based on her

11  observations of Student in the classroom from August 6, 2007 through the end of the first tract of the

12  school year.  Until November 16, 2007, and for over three months, Ms. Briones observed Student's

13  behaviors, the antecedents to his behaviors and had implemented procedures for her and other staff to

14  address and de-escalate those behaviors successfully.  The BSP adopted at the November 16, 2007 IEP

15  included measurable goals that addressed Student's unique behaviors and levels.  Plaintiffs do not

16  challenge the ALJ's findings of fact or conclusions of law, nor do they argue specifically how the

17  November 7, 2007 BSP failed to provide Student with a FAPE.  Accordingly, summary adjudication is

18  denied on this issue.

19            **B.      Whether the District Provided Appropriate Support and Services**

20            Plaintiffs challenge the reading, math, self-help, pragmatic, language, fine motor, sensory

21  integration, and social skills goals that were "in place on November 7, 2007."  This argument is

22  inappropriate for a number of reasons.  First, Plaintiffs identify Student Issues 1(a) and 1(b) as the issues

23  from which they appeal.  Both of those issues relate to behavior services and plans; neither relates to

24  academic-related goals, supports and services.  Second, the ALJ did not address the academic goals,

25  supports, and services of the November 17, 2007 IEP or those that were in place on November 7, 2007

26  in his Decision.  Perhaps because of these shortcomings, District wholly ignored this section in the

27  opposition.  Nevertheless, this Court denies Plaintiffs' motion to the extent they challenge Student's

28  reading, math, self-help, pragmatic, language, fine motor, sensory integration, behavior and social skills

1   goals that were in place prior to the April 4, 2008 IEP.  This Court shall address Plaintiffs' challenge to

2   these goals as written in the April 4, 2008 IEP, restated in later IEPs, and reformulated in later IEPs, in

3   the appropriate sections below.

4   **3.    Whether the ALJ Erred Because District Failed to Conduct Timely OT, Pragmatic Language and Inclusion Assessments during SYs 2007-2008, 2008-2009, and 2009-2010**

5

6          According to the IDEA and California's Education Code, each student must be assessed in all

7   areas of his or her suspected disability. 20 U.S.C. §1414(b)(3); Cal. Educ. Code §56320(f).  Assessments

8   of educational needs must be conducted at least every three years in all areas related to any suspected

9   disability that a student with special needs may have.  A student must be assessed in all areas related to

10  his or her suspected disability, and no single procedure may be used as the sole criterion for determining

11  whether the student has a disability or determining an appropriate educational program for the student.

12  20 U.S.C. §1414(b)(2); 34 C.F.R. §§300.304(b)(2), (c)(4); Cal. Code Ed. §56320(e), (f).  Student had

13  his triennial assessment in April 2008.

14         Plaintiffs argue that the District failed to conduct OT, pragmatic language and inclusion

15  assessments during the relevant school years.  In this motion, Plaintiffs argue at length about District's

16  failure to provide OT assessments regarding Student's sensory needs and District's failure to provide

17  a pragmatics assessment.  Despite this extensive briefing, Plaintiffs prevailed on these issues in the

18  ALJ's Decision.  The ALJ found that the District "should have conducted an OT assessment to Student's

19  sensory integration deficits," and "needed to conduct a pragmatic language assessment." ALJ Decision,

20  p. 54.  Accordingly, Plaintiffs arguments on the issues of OT assessment and pragmatic language

21  assessment are denied as moot.

22         The ALJ found that the District "did not have to conduct an inclusion assessment" during SYs

23  2007-2008, 2008-2009 and 2009-2010.  The ALJ based this conclusion on the following fact: "Student

24  did not present evidence that the District needed to conduct an inclusion assessment for the April 2008

25  triennial assessment, especially because his aggressive behaviors prevented him from attending a less

26  restrictive environment than his present SDC.  Therefore, the evidence does not establish a need for an

27  inclusion assessment."  ALJ Decision, p. 17.  The ALJ reasoned:

28  ///

Student did not establish the area of disability that would have required the District to conduct such an assessment, especially because the LRE for Student was Sierra Vista and Teel and not Student's preferred placement of Creekside. Because Creekside was not Student's LRE, no reason existed to conduct an inclusion assessment. Therefore, Student did not establish that the District needed to conduct an inclusion assessment.

ALJ Decision, p. 55.

During the relevant time period, Mother requested a referral for an inclusion specialist on more than one occasion. An inclusion specialist observes students and programs and gives recommendations for students to be succession in inclusion with regular education students, including mainstreaming into general education classes. First, Mother requested referral at the November 16, 2007 IEP meeting when Student still attended Apricot Valley. Mr. Hodge agreed to contact the Stanislaus Local Planning Area ("SELPA") on this issue and to arrange and inclusion assessment. Due to a backlog, however, the Autism Inclusion Specialist ("AIS"), Ms. Simpson, was unavailable to perform an inclusion assessment for several months. Thereafter, an inclusion assessment was not done. In its place, Ms. Simpson conducted the FAA, as discussed more fully below, and Student was removed from Apricot Valley and placed at Sierra Vista.

The ALJ appears to have considered that an inclusion assessment was not required because, based on the results of the FAA regarding Student's behavior issues, none of Student's LRE options would not have allowed inclusion in a mainstream class. The ALJ further appears to have concluded that District was not required to grant Mother's request for an inclusion assessment while placement options were discussed for SYs 2008-2009 and 2009-2010. The ALJ found that the District did not err by not providing Student with an inclusion assessment, because the District had determined that Student's LRE did not include a mainstreaming option.

Student's inclusion assessment arguments are based the IDEA requirement that each student must be assessed in all areas of his or her suspected disability. 20 U.S.C. §1414(b)(3). Here, District performed its triennial assessment of in all of Student's suspected areas of disability, including cognitive and behavioral tests (the exceptions were noted by the ALJ). Whether Student can be included in a classroom is not an area of suspected disability. An inclusion assessment is part of the IEP team's decision related to what the least restricted environment would be for a student–it does not identify an area of suspect disability. Accordingly, Student's argument on this issue fails as a matter of law.

Even if an inclusion assessment was required, Student fails to establish that District failed to consider inclusion.  Ms. Simpson had assessed Student as an inclusion specialist the year before he was placed at Apricot Valley.  In June 2008, District invited Deb Brown ("Ms. Brown"), another autism inclusion specialist to discuss Student's inclusion possibilities.  At the June 2008 IEP meeting, Ms. Brown opined that "there wasn't enough support for [Student], that they wouldn't be able to provide the necessary inclusion to support a placement in a general education environment." AR at 4310-11. Accordingly, based on Ms. Simpson's 2007 inclusion assessment, Ms. Simpson's 2008 FAA, and the opinion of Ms. Brown and Ms. Lazarri, the autism inclusion specialists agreed that Student was unable to be included in a general education classroom based on his behavior and educational needs. Accordingly, District did not deny Student a FAPE by failing to provide an inclusion assessment.

**4.      Whether the ALJ Erred Because the April 4, 2008 IEP Failed to Establish Appropriate Goals, Did not Provide the Least Restrictive Environment, and Reserved Services without Assessment**

**A.      Whether the April 4, 2008 IEP Established Appropriate Goals**

As to the April 4, 2008 IEP, the ALJ concluded:

[T]he April 4, 2008 IEP contained appropriate goals in reading, math, and fine motor skills, to meet Student's unique needs based on accurate present levels of information and were measurable.  Regarding Student's pragmatic, expressive and receptive language, social skill, and sensory integration deficits, the April 2008 did not contain adequate goals to meet his unique needs because the District had not assessed Student. Additionally, the speech and language goal, which contained social skill elements, merely repeated, with small differences, the April 2007 goal, with no explanation why this slightly modified goal was sufficient to meet Student's unique needs.  This was especially noteworthy because Ms. Simpson's FAA identified communication deficits as a significant reason behind Student's behavior problems.    Regarding sensory integration, Student had deficits that, if addressed, helped him to deescalate based on the testimony of Mr. Lust and Mr. Stevenson.  Because Student's behavior deficits had increased so dramatically and warranted a change of placement, and sensory integration techniques had worked previously, the District should have developed a sensory integration goal to assist Student in using these techniques to deescalate himself.  Student also needed a sensory integration goal to learn how to communicate his emotions as a means to deescalate his behaviors, as contained in Ms. Simpson's BIP recommendations.

ALJ Decision, p. 55.  Thus, the ALJ ruled partially in Plaintiffs' favor, finding that District failed to establish appropriate goals in the areas of speech (pragmatic, expressive and receptive language) and OT (sensory integration or social skills) goals.  Accordingly, to the extent that Plaintiffs argue that the District failed to provide a FAPE because the April 4, 2008 IEP failed to contain appropriate speech, fine motor, sensory integration, or social skills goals, Plaintiffs' motion is denied.

Plaintiffs argue that the reading and math goals contained in the April 4, 2008 IEP were inappropriate because they failed to contain clear baselines. Plaintiffs rely on the testimony of their expert, Michal Post ("Ms. Post"), for their position that the April 4, 2008 IEP had inadequate baseline information about Student. Ms. Post teaches special education at Touro University, and is a credentialed special education teacher. Ms. Post's expertise is in the area of educating children with autism.

The ALJ ruled that the April 4, 2008 IEP "contains specific information regarding Student's present levels of performance." ALJ Decision, p. 21. The ALJ acknowledged that the "baseline information in the District's goals is a bit vague, such as stating in a reading goal that Student reads many sight words." *Id*. The ALJ considered the testimony of Plaintiffs' expert witness, but ultimately gave her opinion limited weight:

> While Ms. Post focused on information in the baseline section on the goal pages, she ignored information in other portions of the IEP, including the FAA, which gave specific information regarding Student's present levels of performance from which the District developed its goals. Ms. Post had not assessed Student, and could not give an opinion whether the District's goals were adequate to meet Student's needs. Therefore, her testimony is given limited weight.

*Id*. The ALJ further considered that the "IEP identified how many sight words Student knew, reading and math abilities and speech and language deficits. The IEP document itself contains specific information regarding Student's present levels of performance for the District to develop its goals, and then to be able to examine Student's progress in meeting these goals in a year." *Id*.

An annual IEP is a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general curriculum; and (2) meet each of the pupil's other educational needs that result from the individual's disability. 20 U.S.C. §1414(d)(1)(A)(iii); Cal. Ed. Code §56345(a)(2). The IEP must be designed to meet Student's unique needs and must be reasonably calculated to enable the child to receive an educational benefit. *Rowley*, 458 U.S. at 206-07.

Plaintiffs fail to establish that the ALJ's findings of fact were clearly erroneous or that the conclusions of law were arbitrary or capricious. The Court defers to the ALJ's findings here, where his reasoning was "thoughtful and thorough," considered the entire IEP document, and offered a "discrete analysis supporting the ultimate conclusions." *Napa Valley,* 496 F.3d at 942-43. While the baseline

section may have been vague, the IEP document contained Student's levels of performance that were clearly articulated. Also, because Student's expert was unable to opine whether the goals were adequate to meet Student's needs, the Court refuses to question the credibility of Plaintiffs' expert. *See Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1127-28 (9th Cir. 2003) (district court defers to ALJ's credibility determinations). Further complicating matters, Student has been outside of District placement, making clear levels of performance difficult. Based on these considerations, this Court defers to the ALJ's findings of fact and concludes that it was not clearly erroneous. Plaintiffs fail to establish that District denied Student a FAPE based on the vagueness of the goals in the goal pages of the IEP. For these reasons, Plaintiffs' motion on this issue is denied.

## B.     Whether Sierra Vista Placement was the LRE

A special education student must be educated in the least restrictive environment ("LRE"), and should be mainstreamed with non-disabled peers to the maximum extent possible. "The language of the IDEA...clearly indicates a strong preference for 'mainstreaming,' i.e. educating handicapped children alongside non-handicapped children in a regular educational environment." *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) (citing *Rowley*, 458 U.S. 176, 188-89). "Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, i.e., they should be mainstreamed. 20 U.S.C. §1412(a)(5)(B)..." *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996). 20 U.S.C. §1412(a)(5)(B) requires:

> To the maximum extent appropriate, children with disabilities...are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

"In carrying out this directive, the state educational agency must develop and implement an IEP aimed at providing each disabled child with a [FAPE] in the least restrictive environment." *Poolaw*, 67 F.3d at 834 (citing 34 C.F.R. §300.550 et seq.).

The question of what constitutes an LRE is necessarily an individualized, fact-specific inquiry. In each case, the apparent tension between the IDEA's clear preference for mainstreaming and its requirements that schools provide individualized programs tailored to the specific needs of each disabled child must be balanced. 20 U.S.C. §§ 1401, 1414(a)(5); *see also, J.W. v. Fresno Uni. Sch. Dist.,* 626 F.3d

431, 448 (9th Cir. 2010). In considering whether the District proposed an appropriate placement for Student, the Court balances four factors: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect Student had on the teacher and children in the regular class; and (4) the costs of mainstreaming Student." *Sacramento City Uni. Sch. Dist., Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994) ("*Rachel H*. factors"). "This analysis directly addresses the issue of the appropriate placement for a child with disabilities under the requirements of 20 U.S.C. § 1412(5)(B)." *Id.*

At the time of the Sierra Vista offer, Student did not assert that he belonged in a general education classroom. Rather, Student argued that Sierra Vista was a more restrictive setting than Ms. Briones' SDC class at Apricot Valley, a regular education school, and that Student could have been properly educated in the Apricot Valley SDC with proper behavioral supports. Sierra Vista is a non-public school that specializes in educating autistic children with significant behavioral problems and cognitive deficits. Sierra Vista is a more restrictive educational setting than Apricot Valley because Sierra Vista is located on a self-contained campus with no access to general education students.

Sierra Vista has small classes with 10 to 12 students and a high staff-to-student ratio. A typical Sierra Vista class would be staffed with one teacher, two aides, instructional aides, and a clinician. AR at 2861. Sierra Vista provides students with a functional curriculum that follows the state's standards and incorporates ABA methodology into its instruction with staff. Sierra Vista staff is trained in ABA techniques. Group therapy and social skills training is embedded in its program. The goal of Sierra Vista is to transition students to a less restrictive environment. AR at 2865.

The ALJ concluded that the Sierra Vista placement offer did not deny Student a FAPE based on the following considerations:

### i.    Educational benefits

The ALJ concluded that both Apricot Valley and Sierra Vista offered Student about the same level of general academic benefit. Both Ms. Briones' SDC and Sierra Vista's academic focus is functional life skills.   Teachers have similar credentials at both Apricot Valley and Sierra Vista.

### ii.    Non-academic benefits

The ALJ concluded: "Other than Student's limited interaction with general education students

26

at Apricot Valley, Student obtained about the same non-academic benefit at both schools." ALJ Decision, p. 24. At Apricot Valley, Student spent 95 percent of his school day in special education and five percent with regular education students. At Sierra Vista, Student's time in special education was 100 percent. The ALJ explained that despite this difference, "Student did not establish the non-academic benefit he received by having access to general education students at Apricot Valley because his behavioral deficits prevented his access to general education students." *Id*.

Both schools took students off campus for socialization and life skills instruction, such as visiting a supermarket to purchase items. Students in the SDC at Apricot Valley had fewer behavioral problems than students at Sierra Vista. Students at both locations had similar cognitive and verbal abilities.

### iii.    Effect Student had on teacher

The ALJ found that Student's behavior problems prevented him from accessing his education in the Apricot Valley class. Student disrupted his Apricot Valley SDC class and interfered with Ms. Briones' ability to work with other students while she handled Student's behavioral problems. Although the BIP developed by Ms. Simpson was appropriate, and Ms. Briones and her staff had training, Student's needs exceeded their capabilities. Student had reached a point where he required an intensive behavioral program, which Sierra Vista offered and Apricot Valley did not. Student's escalating behaviors, probably caused by the change in medications, could not be resolved through the sensory integration techniques, a different BIP, or other supports. The ALJ concluded that Student could not obtain an educational benefit in an SDC because the intensity of his behavioral problems required intensive intervention that could not be provided in the Apricot Valley SDC.

### iv.    Cost

The parties did not submit evidence on this factor.

### v.    Conclusion

The ALJ concluded:

> Student required a more comprehensive approach to reduce his behavioral problems so that he could later return to a less restrictive environment. Sierra Vista's comprehensive program met Student's needs with the supports and services it provided. Although Student had previously succeeded in the District's SDC at Apricot Valley, his increasing bheavior problems required a different approach, which Sierra Vista provided. Therefore, Sierra Vista was the LRE for Student in April 2008.

1    ALJ Decision, p. 25.

2         Student argues that Sierra Vista provided less educational benefit than Apricot Valley, because

3    Student had a demonstrated need to be around typical, higher functioning peers for academic, social, and

4    behavioral reasons. Student relies on the assessments and testimony of Dr. Brown, Dr. Deprey and Ms.

5    Heidemann to establish Student's "demonstrated needs."  In addition, Plaintiffs argue that the ALJ's

6    conclusion regarding Student's academic levels were erroneous, because the ALJ failed to consider the

7    assessments of Dr. Brown and Dr. Deprey.   Moreover, Plaintiffs contend that Student made no

8    educational progress at Sierra Vista and Student experienced substantial problems on the long bus ride

9    to and from Sierra Vista.

10        Plaintiffs' arguments are misplaced, as they attempt to consider the placement offer in hindsight.[8]

11   According to the snapshot evaluation, the ALJ could not consider evidence that was not known to the

12   parties at the time the offer was made to determine whether the placement offer denied Student a FAPE.

13   Dr. Brown[9] and Dr. Deprey had not evaluated Student until months after this April 2008 placement offer.

14   It could not be known (and is now disputed) whether Student made educational progress after his Sierra

15   Vista placement.  Accordingly, Plaintiffs have failed to establish that the ALJ erred to conclude that the

16   Sierra Vista placement offer in April 2008 provided Student with a FAPE.

17        Moreover, based on the behavioral issues that Student exhibited in the Apricot Valley SDC class,

18   and Ms. Briones' repeated failures to de-escalate Student, demonstrated by the repeated restraints used

19   in December 2007 and January 2008, it was reasonable to conclude that the Apricot Valley SDC did not

20   meet Student's needs. Based on the evidence, Sierra Vista was reasonably calculated to be the least

21   restrictive environment appropriate to Student's needs.  Accordingly, Plaintiffs' motion on this issue is

22   denied.

23        **C.      Whether the IEP was Implemented at Sierra Vista**

24        A "failure to implement an IEP may deny a child a free appropriate public education and thereby

25

26   _____

27        [8]Defendants' arguments in opposition also fail for this reason.  Defendants' opposition relied exclusively on information gathered after Student began attending Sierra Vista.

28        [9]In addition, as explained more fully below, Dr. Brown's testimony does not contradict this type of placement.

give rise to a claim" pursuant to the IDEA. *Van Duyn*, 502 F.3d at 821.   To establish an IDEA violation for failure to implement an IEP, Student must show that there was a material violation. *Id*.   "A material violation occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id*. at 822.   A student is not required to demonstrate that he or she suffered demonstrable educational harm to prevail on a claim that District failed to implement an IEP. *Id*.

The parties suggest that Sierra Vista did not receive Student's April 2008 IEP until two weeks after Student began attending the school.   Student argues that during this time, District failed to provide Student a FAPE, because his April 2008 IEP was not implemented.   Specifically, Student argues that Sierra Vista could not have implemented his BIP during this time since it was not at Sierra Vista.

On the issue of whether Sierra Vista implemented Student's BIP, the ALJ found:

> Sierra Vista implemented Student's BIP.   Sierra Vista's comprehensive behavior program included elements in Student's BIP, and was effective in improving Student's behavior as the number of improper behaviors decreased.   Sierra Vista did not have to use all of the elements of Student's BIP that were not included in its behavior program because its behavior program was effective.   Therefore, Sierra Vista materially implemented Student's BIP through its use of its behavior program.

ALJ Decision, p. 56.

The testimony of Kim Hanby ("Ms. Hanby"), Director of Educational Services at Sierra Vista, disputes this conclusion.   Ms. Hanby testified that Sierra Vista had Student's BIP during this time period. She clarified that "the BIP and the IEP were there, but the file, when they transition schools, we have to formally request the actual file from the previous school site and it usually takes a little while for the mail.   That's what took the time to get to our setting."   AR at 2902.   Thus, Sierra Vista staff confirms that they reviewed Student's IEP and BIP, and implemented those during the relevant time period.   Sierra Vista operated during this time, however, without Student's complete file.

Assuming that it was a procedural error because Sierra Vista educated Student without the complete file for two and a half weeks, the Court must next determine whether there was a "material violation" of Student's BIP.   To determine whether the IEP violation was material, this Court finds *Neosho R. V. Sch. Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003) to be instructive.   In *Clark*, the Court considered whether failure to implement an IEP that addressed a student's behavior constituted a

1  material violation of the IDEA.  The court ruled the IDEA is violated "if there is evidence that the school

2  actually failed to implement an essential element of the IEP that was necessary for the child to receive

3  an educational benefit." 315 F.3d at 1027 n.3 (quoted in *Van Duyn*, 502 F.3d at 822).  The Ninth Circuit,

4  in adopting this approach, explained:

5      To determine if the fact that no cohesive plan was in place to meet [the child's]
       behavioral needs gave rise to a statutory violation, the court considered both the shortfall
6      in services provided and evidence regarding the child's progress in several areas. The
       court concluded that the IDEA was indeed violated because the actions taken by the
7      school did not appropriately address [the child's] behavior problem, and any slight benefit
       obtained was lost due to behavior problems that went unchecked and interfered with [the
8      child's] ability to obtain a benefit from his education.

9  *Van Duyn*, 502 F.3d at 822 (quoting *Clark*, 315 F.3d at 1027*)* (internal citations and quotations omitted).

10     The instant action differs from *Clark* in a number of ways.  First, it is unclear whether Sierra

11  Vista had Student's BIP during this time period.  Even if Sierra Vista did not have Student's BIP for the

12  first two and a half weeks, Sierra Vista had a cohesive plan in place; namely, the school's comprehensive

13  behavior plan that included many of the same elements as Student's BIP.  Student has failed to establish

14  that there was shortfall or absence of behavioral services throughout this period, particularly when Sierra

15  Vista had behavioral specialist and support staff who worked with Student.  Student's behavior problems

16  did not go unchecked.  Rather, Sierra Vista staff used the techniques identified in their program and their

17  specialized behavior training to address Student's needs.  In addition, when Sierra Vista staff received

18  and  reviewed  Student's  BIP,  they  found  that  Sierra  Vista's  comprehensive  behavior  program

19  "incorporated nearly all" of the strategies contained in Student's BIP.  Student fails to point out which

20  strategies used by Sierra Vista were not part of his BIP and, if such strategies were used, how the

21  difference in strategy used was material.  Based on these facts, this Court finds Student failed to establish

22  a material violation of the IDEA for failure to implement his BIP at Sierra Vista.

23     Plaintiffs also argue that District denied Student a FAPE by failing to implement speech and OT

24  services in Student's IEP.  As previously set forth, the ALJ found that the April 4, 2008 IEP failed to

25  establish adequate speech and OT goals that appropriately met Student's unique needs.  Unfortunately,

26  even those inadequate goals were unmet, as Sierra Vista staff were unable to provide Student with

27  speech and OT services due to staffing problems.  Nevertheless, the ALJ ruled in Plaintiffs' favor on this

28  issue: "Regarding OT and speech and language services, these services were not provided to Student at

1   Sierra Vista pursuant to the IEP because of staffing problems, and this denied Student a FAPE." ALJ

2   Decision, p. 56.  Accordingly, Plaintiffs motion on this issue is denied as moot.

3         **D.**        **Whether Services were Reduced without Assessment**

4        At the administrative level, Student argued that the April 4, 2008 IEP denied Student a FAPE

5   because District unilaterally reduced Student's speech and language and OT services.  Student prevailed

6   partly on this issue.  The ALJ ruled: "Student established that the District violated his procedural rights,

7   which denied him an educational benefit, because the District failed to adequately explain at the IEP

8   meeting why it removed the 20 minutes a week of direct OT services...Therefore, the District denied

9   Student a FAPE." ALJ Decision, p. 56.  The ALJ's conclusion of law is silent as to the alleged reduction

10  of speech and language services, although the ALJ found factually that there was no unilateral change

11  in speech and language services in the April 2008 IEP.

12       By way of footnote, Plaintiffs acknowledge that the ALJ ruled in their favor partially on this

13  issue, and note that they appeal the "remaining issues presented by Student."  In the body of the

14  memorandum of points and authorities, however, Plaintiffs argument relates solely to OT services and

15  the alleged reduction that took place in the November 16, 2007 IEP.  Plaintiffs set forth no argument in

16  their motion related to speech and language services.

17       To the extent that Plaintiffs appeal the ALJ's decision on the issue of speech and language

18  services, the motion is denied.  Plaintiffs fail to establish why the ALJ erred, or that District changed the

19  services from the April 2007 IEP to the April 2008 IEP.  The Court notes that, as explained above,

20  District failed to provide those services at Sierra Vista due to staffing issues.  The services provided for

21  in the April 2008 IEP, however, remained the same and were not reduced unilaterally without

22  assessment.

23       To the extent that Plaintiffs appeal the ALJ's ruling related to OT services, this Court finds that

24  Student fully prevailed on that issue at the administrative level.  The ALJ found that the District failed

25  to explain the change in OT services and failed to assess Student in OT services before the change.  The

26  ALJ concluded that the District denied Student a FAPE.  Because Plaintiffs prevailed on the issue of

27  whether District reduced Student's OT services without assessment, Plaintiffs' motion on this issue is

28  denied.

**5.      Whether the ALJ Erred Because District Offer of Teel was not Reasonably Calculated to Provide Student with Meaningful Educational Progress in an LRE and Student's Supports were Inappropriate Because They were Not Developed Pursuant to the Hughes Bill**

**A.      Whether Teel was an LRE**

At the end of SY 2007-2008, parents removed Student from Sierra Vista.  In an August 2008 IEP, District offered stay put placement at Sierra Vista.  In addition, other placements were discussed and District offered placement at Teel.  That offer continued through SY 2008-2009 and 2009-2010. Plaintiffs did not accept the Teel placement offer in August 2008.  Subsequently, Plaintiffs rejected the offer and requested placement at Creekside.  The parties' inability to agree on Student's placement continued through SY 2008-2009 and 2009-2010.

Stanislaus County Office of Education ("SCOE") runs the Teel SDC, which is designed for children with autism.  It is a self-contained classroom adjacent to a regular education campus, operated by another school district.  The SDC is for students in grades six through eight and has fewer than ten students, with a credentialed teacher and a classroom aide.  Most students in the class, like Student, have their own one-to-one aide. The classroom teacher and staff are trained in behavior techniques, including ABA and Treatment and Education of Autistic and Communication-Related Handicapped Children ("TEACCH"), and have received physical restraint training.  Similar to Sierra Vista, Teel is a highly structured program with onsite behavior improvement case managers ("BICMs") to address Student's behavior and provide needed assistance and support to classroom personnel.  Discrete trial training ("DTT") is available for students who require DTT instruction for academics.  Like Sierra Vista, Teel is designed to improve a student's behavior to allow a student to return to a lesser restrictive setting.

Student argued that Teel was an inappropriate offer because an autistic classroom is too restrictive an environment and does not offer Student an educational benefit.  Student also objected to the long bus ride to and from Teel.  At the October 6, 2008 IEP meeting, Mother requested District to place Student at Creekside Middle School in a learning handicapped ("LH") SDC with a one-to-one ABA-trained aide, and behavior support services to be provided by a non-public agency.  District opposed the placement, because it was District's position that Student's behavior and cognitive needs would not be met adequately at Creekside.

As set forth above, this Court considers the following factors to determine whether the offered

1   placement constituted an LRE:

2                 *i.*     *Educational benefits*

3         The Creekside LH SDC is classified as a mild-to-moderate classroom and is located within the

4   Creekside campus. Students in the Creekside LH class are more advanced academically than the students

5   in the Teel autistic class.  Student argues that District underestimates his learning abilities and that he

6   could perform the academic work at Creekside with the assistance of a one-to-one aide provided through

7   a non-public agency.  District contends that Student is significantly below the functioning ability of the

8   Creekside students, and that Creekside would be more isolating, because he would be working on a

9   different educational curriculum than his classmates and isolated with his one-to-one aide.

10        The parties dispute Students' academic levels and ability.  Mother asserts that Student functions

11  higher than District estimates and belongs in a classroom with higher functioning students.

12        The evidence supports the conclusion that placing Student in a more advanced educational

13  environmental would not be reasonably calculated to meet his needs.  Ms. Hanby explained that Student

14  had a "rough period" when he first arrived at Sierra Vista, because he was placed in a classroom with

15  higher functioning students at the request of Mother.  AR at 2885.  Student "would want to stay in the

16  high preferred activity versus transitioning to a low, or less preferred activity.  And that's when we

17  would see the aggression. He would demonstrate a lot of physical aggression; hitting, kicking, swatting,

18  sometimes cussing." AR at 2886.  It was during this time that Student was restrained at Sierra Vista.

19  When he was moved to a classroom with students who functioned closer to his level, however, Student's

20  behavior was more manageable, and Sierra Vista staff felt that Student made positive progress

21  academically and behaviorally.  Dr. Brown agreed that it "would be a problem" if a student with autism

22  received ABA services on a one-on-one basis in a class that was a general education setting in which the

23  other children were studying a general education curriculum that was several grades higher than what

24  the autistic student was studying. AR at 3061.  He further opined that it would not be beneficial for

25  Student to be placed in this hypothetical situation or in a situation in which Student was working at a

26  different level academically from other students in the class. AR at 3072.  Accordingly, Student's unique

27  needs required placement in a classroom that did not exceed his academic abilities.

28        Moreover, the evidence supports the ALJ's conclusion that the academic expectations at

1   Creekside would exceed his ability, leading to off-task behaviors and increased aggression.  The

2   Creekside LH classroom presented academic material at the third-to-sixth-grade level based on general

3   education state standards.  Prior to the Teel offer, Student was working on second-grade level work at

4   Apricot Valley and Sierra Vista.  According to Ms. Briones, at the time of the April 2008 IEP meeting,

5   Student knew about 90 sight words, could do double digit addition and double digit subtraction, could

6   tell Ms. Briones numbers from 1 to 100, could write the numbers, and could count by fives. AR at 2711.

7   Ms. Briones characterized Student as being one of the brightest Students in her SDC SH class, but below

8   the level of the general education students. AR at 2755.  In her opinion, Student "would do better in a

9   place that didn't have such an academic focus." AR at 2741.  Student's home instruction teacher, Jayme

10   Gray ("Ms. Gray"), was using curriculum at the kindergarten through second grade level.  Similarly,

11   according to Shannon Heidemann, Student worked well in the home environment on first- to second-

12   grade material.  AR at 3513.  Dr. Brown agreed that Student was at the second grade level and that it

13   would be fair to characterize someone with Student's verbal abilities as having a low cognitive ability.

14   Moreover, the results of the Woodcock-Johnson II test and Dr. Schneider's results revealed that Student

15   needed visual cues to learn because of his verbal deficits.  Creekside's instruction, presented orally,

16   would not meet Student's needs and would create an environment in which Student was working parallel

17   to, and isolated from, the rest of the class.

18       Moreover, the opinions of Ivanna Rouppet ("Ms. Rouppet") establish that Creekside was not a

19   good placement for Student.  Ms. Rouppet tested Student at Creekside.  Because of his inability to focus,

20   she deviated from the testing procedures in a number of ways to complete the test.  Although his scores

21   improved, Ms. Rouppet agreed that Student's skill level was "that of late kindergarten or early first

22   grade." AR at 3694.  Based on her observations of Student and her knowledge of Creekside, she opined

23   that Student would be unable to keep up with the pacing schedule and standards that Creekside teaches

24   in the LH classroom.  Creekside teaches math and language arts at the sixth through eighth grade levels.

25   No one at Creekside is below Student's functioning level. AR at 3721.  Student would be pulled from

26   the classroom often, for most of the day.  *Id*. at 3715.  According to Ms. Rouppet, the teacher at

27   Creekside would not be able to devote the individual attention to Student that he needs for his

28   academics. *Id.* at 3714.  Based on these considerations, the ALJ properly concluded that Student would

not obtain significant academic benefit attending Creekside.  As explained more fully below, Teel was reasonably calculated to address Student's unique needs and provided him with opportunities to succeed academically.

<em>ii.     Non-academic benefits</em>

In addition to more closely matching Student's academic abilities, Teel provided Student with non-academic benefits.  Deborah Lazarri ("Ms. Lazarri"), Teel program director, explained why she opined at IEP meetings that Creekside was an inappropriate placement for Student.  "I didn't, at that time, believe that a Learning Handicap classroom could provide an environment that...was highly likely to promote his success." AR at 3305.  She thought Creekside would not promote Student's success because "typically LH classrooms are not designed with an ABA approach and that the individual that works with students in terms of ABA in those classrooms is generally a classified or a para-educator....And the Creekside placement did not appear to me to have that level of support that I believe [Student] needs." AR at 3305-06.

Moreover, there were mainstreaming opportunities at Teel.  According to Ms. Lazzari, Teel students were given the opportunity to mainstream with general education classrooms as per their ability. AR at 3309.  The Teel program is located on an integrated site with a general education school also on site. *Id*.  Thus, Student would have opportunities to interact with mainstream students.  In addition, students have the opportunity at Teel to interact with mainstreamed students during lunchtime.

Additionally, while Teel had an autistic program, Creekside did not.  No teachers or staff were trained in areas related to autism.  Thus, the non-academic benefits to Student were greater at Teel.  For instance, Ms. Rouppet felt that Creekside was an inappropriate placement for Student because "typical students on the Creekside campus wouldn't know how to react to [Student's] behavior, not his academic things, but how he behaves.  And I think that puts him in a very bad situation for bullying and for other things." AR at 3709.  Ms. Roupett did not think that the LH at Creekside would be safe for Student, because the teachers and staff were not trained. AR at 3710.  Based on these non-academic benefits, Teel was an appropriate placement for Student.

<em>iii.     Effect Student had on teacher</em>

Student's presence in the Creekside classroom would more than likely distract the other students

35

and the teacher.  Student's need for visual cues in the classroom would district the other Students.  AR at 3710.  Similarly, the verbal interaction between Student and his one-on-one aide would be distracting. *Id*.  In addition, the testimony of several witnesses supports the position that Student was disruptive in the classroom environment because of his need for redirection.  The evidence reflects that when Student becomes frustrated, he can become aggressive.  Student has a history of hitting, slapping, pinching, and swatting other students and staff, particularly when placed in a high demand setting.  Student also uses profanity in the classroom, which would "definitely stop the education process and interfere with the learning of others in the classroom."  AR at 3711.  Student was restrained at both Apricot Valley and Sierra Vista based on aggressive behavior, requiring multiple staff members to contain Student.  Moreover, the teacher and staff at Creekside are not trained in methodologies related to autistic students.  The class does not offer ABA-based curriculum or a token economy.  In addition, Student was unable to attend to his work beyond five or ten minutes without significant redirection.  Because Creekside would be a high demand environment and place higher academic demands on Student, the evidence supports the ALJ's conclusion that Student would most likely disrupt the class at Creekside.  On the other hand, the Teel autistic classroom was better equipped to address Student's unique needs, and Student would more than likely be less distracting in that environment.

### iv.    Cost

The cost of providing non-public agency supports to Student with a Creekside placement would be approximately $50,000.  The cost of providing dedicated transportation to Student to and from Teel to address parents' concern regarding the long bus ride would also cost approximately $50,000.  Accordingly, this factor is neutral as it relates to the proper placement for Student.

### v.    Conclusion

The ALJ properly concluded that Teel was the LRE for Student.  Student relies heavily on the testimony of Dr. Brown, who testified that he thought placing children with autism in programs where they mainly interacted with other autistic children "compounds the problem they have because it limits their availability to model a more appropriate behavior."  AR at 3033.  Nevertheless, Dr. Brown conceded that Student was able to model some of the more appropriate behavior exhibited by other students the MIND Institute.  AR at 3035.  These students all had autism.  *Id*.  In addition, Dr. Brown noted that

Student was successful in a completely autistic-populated classroom with students of varying capabilities, such as the one at the MIND Institute. AR at 3047.  Dr. Brown further opined that an appropriate placement for Student wold "involve a highly structured program with a token economy and visual supports, and embedded ABA services and ABA approaches and data taking." AR at 3060. Ultimately, Dr. Brown opined that he would expect Student to have behavioral challenges in an academic environment, because of a learned aversion or avoidance to academics, and perhaps because of sensory issues.  AR at 3105-06.  He recommended a highly structured program with a focus on ABA type strategies.  *Id*. at 3107.  Dr. Brown recommended that Student would need a person to help him learn replacement behaviors for his maladaptive behaviors.  *Id*.

The Teel placement was calculated to meet Student's unique needs.  The Teel placement provided Student with a structured environment, ABA-trained staff, and otherwise met all criteria set forth by Dr. Brown as an appropriate placement for Student.  Ms. Lazzari agreed, opining that Teel was the appropriate placement for Student because "it's a highly structured program.  There is a very strong ABA program implemented as well as access to the Teach curriculum and vocational education. There's programs for self-help and social development and it's–it's a good program." AR at 3310.  In addition, the teacher at Teel is "excellent." *Id*.  The teacher and staff had ongoing training twice a month with behavior analysts.  Staff is ABA trained, and the ongoing training is ABA training.  The staff is trained in the implementation of each student's BIP and IEP.  All Teel classrooms have a BCBA assigned to them as consultants. AR at 3312.  Teel is a highly structured setting with a token economy that uses discrete trial training and ABA techniques.  In addition, speech and OT services are available to the students in the classroom. AR at 3313.  Ms. Lazzari was aware that some autistic students have been placed in SDC LH programs with additional supports but opined that placement is appropriate when the student requires less intensive ABA services than Student requires. AR at 3337.  Moreover, Dr. Duprey recommended a 25- to 35-hour week intensive ABA program.  Teel provided six hours per day of an ABA-intensive program, consistent with Student's experts' recommendations and opinions.  Based on these considerations, the ALJ properly concluded that Teel was the LRE for Student, as it was reasonably calculated to meet Student's unique needs.

///

**B.      Whether the FAA Performed by Simpson Met Hughes Bill Requirements**

Student asserts that FAA performed by Ms. Simpson violated the Hughes Bill in a number of ways. First, Plaintiffs argue that Ms. Simpson's FAA failed to specify the assessment methods that were used, the dates of the assessment and the data collection methods. Second, Plaintiffs argue that there was no information in the report indication whether Ms. Simpson reviewed Student's health information. Third, Plaintiffs contend that Ms. Simpson never saw or considered the data taken by Ms. Briones indicating that Student had been restrained on multiple occasions. Plaintiffs conclude that based on the failure to obtain the required data, the FAA was incomplete and inappropriate, and denied Student a FAPE as a matter of law.

The Hughes Bill sets forth the requirements for an FAA as follows, in relevant part:

(b) Functional Analysis Assessments. A functional analysis assessment must be conducted by, or be under the supervision of a person who has documented training in behavior analysis with an emphasis on positive behavioral interventions. A functional analysis assessment shall occur after the individualized education program team finds that instructional/behavioral approaches specified in the student's IEP have been ineffective.

Functional analysis assessment personnel shall gather information from three sources: direct observation, interviews with significant others, and review of available data such as assessment reports prepared by other professionals and other individual records.

(1) A functional analysis assessment procedure shall include all of the following:

(A) Systematic observation of the occurrence of the targeted behavior for an accurate definition and description of the frequency, duration, and intensity;

(B) Systematic observation of the immediate antecedent events associated with each instance of the display of the targeted inappropriate behavior;

(C) Systematic observation and analysis of the consequences following the display of the behavior to determine the function the behavior serves for the individual, i.e., to identify the specific environmental or physiological outcomes produced by the behavior. The communicative intent of the behavior is identified in terms of what the individual is either requesting or protesting through the display of the behavior;

(D) Ecological analysis of the settings in which the behavior occurs most frequently. Factors to consider should include the physical setting, the social setting, the activities and the nature of instruction, scheduling, the quality of communication between the individual and staff and other students, the degree of independence, the degree of participation, the amount and quality of social interaction, the degree of choice, and the variety of activities;

(E) Review of records for health and medical factors which may influence behaviors (e.g. medication levels, sleep cycles, health, diet); and

38

1        (F) Review of the history of the behavior to include the effectiveness of previously used
2    behavioral interventions.

3    5 Cal. Code Regs., §3052.

4        Ms. Simpson conducted Student's FAA in January 2008. She observed Student for four or five

5    days in the school environment; specifically, she observed Student in Ms. Briones' class during group

6    and individual instruction, independent work, recess, lunch, library, and his speech and language

7    sessions. Ms. Simpson collected data during her observations regarding the targeted behaviors to

8    examine the causes of Student's behaviors and to determine what interventions the District could put

9    in place to reduce the maladaptive behaviors. She also interviewed Parents, Ms. Briones, and classroom

10    staff. Ms. Simpson also worked directly with Student.

11        Student's expert witness, Keith Storey, Ph.D. ("Dr. Storey"), reviewed Ms. Simpson's FAA and

12    concluded that it was inadequate. Dr. Storey criticized the FAA for not including the dates and times

13    she observed Student. In addition, Dr. Storey pointed out that the FAA lacked copies of data sheets that

14    Ms. Simpson collected regarding Student's targeted behaviors.

15        Regarding the FAA, the ALJ concluded:

16        While Dr. Storey challenged the form of Ms. Simpson's FAA and BIP and program
    recommendations and modifications, he did not challenge whether the FAA and BIP
17        would improve Student's targeted behaviors...While Dr. Storey's recommendation may
    represent the best practices, his critique of Ms. Simpson's FAA and BIP did not establish
18        that the FAA was not properly conducted and drafted...Although Ms. Simpson's FAA
    should have contained more information regarding her observations of Student, her
19        failure to include that information does not invalidate the accuracy of the information
    contained in the FAA regarding Student's aggressive and non-compliant behaviors and
20        the possible causes...Therefore, Ms. Simpson's FAA...[was] properly created and
    adequately designed to address Student's behavior problems.
21

22    ALJ Opinion, p. 15. The ALJ further concluded: "The defects in Ms. Simpson's FAA, as pointed out

23    by Dr. Storey, were as to form and not substance because Student did not establish that Ms. Simpson's

24    FAA did not accurately reflect reasons for his behavioral problems, and their frequency." *Id.* at p. 51.

25        The ALJ's conclusion is supported by the testimony presented. Dr. Storey correctly pointed out

26    the form of Ms. Simpson's FAA lacked details. Ms. Simpson's FAA lacked specific dates and times

27    as to behaviors observed and there was no evidence that Ms. Simpson reviewed Student's medical

28    records. Notwithstanding these deficiencies in form, Ms. Simpson observed Student systematically over

1  a number of days in multiple settings in the school environment.  She also interviewed Student's teacher,

2  classroom staff, and parents.  While there is no evidence that Ms. Simpson reviewed Student's medical

3  records, Mother discussed with Ms. Simpson that a change in medication may have been a partial basis

4  for an increase in Student's negative behaviors.  In addition, Dr. Storey did not opine whether the FAA

5  denied Student a FAPE.  Accordingly, Student fails to establish that Ms. Simpson's FAA denied Student

6  a FAPE, and Student's motion on this issue is denied.

7         **C.      Whether the BIP Developed by Simpson Was Appropriate**

8         After preparing the FAA, Ms. Simpson developed and presented a BIP to the IEP team.  Ms.

9  Simpson recommended interventions for Student that included behavior specific praise, concrete social

10  stories, and a visual schedule that Student would be able to manipulate.  Ms. Simpson recommended a

11  token-reward system.  In addition to positive reinforcement, Ms. Simpson's BIP included punitive

12  consequences, including the loss of tokens when Student was assaultive and other efforts to de-escalate

13  him were unsuccessful.  Ms. Simpson's BIP also included the use of the word "no," based on her

14  perspective that this trigger word needed to be addressed with Student to developed a functional life

15  skill.  Ms. Simpson's BIP also provided for SELPA-approved restraints if necessary to de-escalate

16  Student's behaviors.  Ms. Simpson concluded that in her opinion, the BIP was appropriate to meet

17  Student's unique needs.  The IEP team approved the BIP.  The ALJ concluded that Ms. Simpson's BIP

18  was appropriate and did not deny Student a FAPE.

19         Plaintiffs' challenge of the BIP is based on the testimony of Dr. Storey.  Dr. Storey criticized the

20  BIP for including punitive and aversive interventions.  Dr. Storey opined that the recommendation to

21  use the word "no" when Student failed to comply with instructions was erroneous, because the word

22  "no" is a known trigger that escalates Student's behaviors.  Dr. Storey noted that the BIP recommended

23  taking away tokens, recess, and end of day activities, removing Student from class immediately after

24  assaulting a peer and consequenting the behavior with the school conduct code.  The BIP recommended

25  that staff give Student one warning if he made physical contact with a staff member before taking away

26  all of his tokens.  Dr. Storey opined that none of these interventions is positive.  In addition, Dr. Storey

27  opined that the token economy system would remove Student's incentive to comply and removing

28  Student to a predetermined location would reinforced Student's behaviors when he desired to leave the

classroom.  Moreover, Dr. Storey challenged the use of restraints.  In Dr. Storey's opinion, containing Student on the floor would provide him with attention, which was another function of his behavior and would reinforce the negative behaviors.

Regarding the punitive consequences included in the BIP, the ALJ correctly noted that "Dr. Storey's critique of Ms. Simpson's FAA and BIP was more of a methodological criticism of the BIP being too punitive, not a conclusion that the FAA and BIP would not work." ALJ Decision, p. 15. Indeed, while Dr. Storey criticized the punitive consequences, he "offered no explanation as to what he would recommended be included in an FAA and BIP about how to handle an assaultive student who represented an immediate threat to staff or other students." *Id*.  Moreover, the opinion of another expert presented by Student, Dr. Brown, supported the use of punitive consequences in Ms. Simpson's BIP. Dr. Brown stated that the use of punitive consequences can be effective in controlling behavior and that this opinion is supported by data.  Accordingly, the ALJ's decision was supported by evidence.

Similarly, the evidence supports the ALJ's conclusion that the aversive techniques included in the BIP were appropriate.  Ms. Simpson explained that while she understood that the word "no" was a trigger for Student, she included it in the BIP because "part of the Hughes Bill says that the goal is to integrate [Student] into society. So he can't be..engaging in aggression every time he's told no.  That's not–he won't be successful in society.  So I choose [sic] to utilize that in my plan." AR at 2589.  Ms. Simpson further explained the importance of addressing Student's trigger:

> In my experience if I've had a student that has an aversion to a specific stimulus that he or she's going to encounter in the environment or in the world, we need to address that because its setting up the child to be–setting that child up to be unsuccessful long term. We just don't use the world no, is what I call a band-aid solution so it just kind of covers the problem up, but it doesn't teach a skill.  And Hughes Bill states that we are obligated to teach skills.

AR at 2624.  Ms. Simpson is a board certified behavior analyst, an autism inclusion specialist, and a behavior intervention case manager.  She holds a master's degree in applied behavior analysis.  Unlike Dr. Storey, who never met Student, Ms. Simpson formed her opinion after observing him in the classroom over a number of days.  Based on her experience and observation, Ms. Simpson's testimony established that the inclusion of aversion techniques were formulated based on his unique needs and to teach Student an important functional life skill.  Accordingly, the ALJ did not err to conclude that the

1  BIP provided Student a FAPE.

2  **6.      Whether the ALJ Erred Because District Predetermined Teel Placement**

3        Plaintiffs argue that the ALJ erred to conclude that District did not predetermine its offer of Teel

4  placement in the August 26, 2008 IEP, October 6, 2008 IEP, and April 29, 2009 IEP, as modified by the

5  July 29, 2009 written offer.  The Court considers each offer separately as a snapshot evaluation, but will

6  only consider Plaintiffs' arguments as presented properly in this motion.

7        The ALJ properly concluded that as of the August 2008 IEP meeting, the Teel Placement was

8  not predetermined, for the following reasons:

9        Regarding possible placements, the District considered several placements, including
         Teel, because of Mother's statement that she would not return Student to Sierra Vista.
10       Mr. Hodge explore possible placement options.  Some were rejected because students in
         those programs were too low-functioning compared to Student.  The District, SELPA,
11       and SCOE representatives explained their decision-making process at the IEP meeting,
         and why they believed that Teel was the appropriate placement for Student.
12       Additionally, although the District still considered Sierra Vista was the appropriate
         placement for Student, and continued to offer this as Student's stay put placement, the
13       District researched other possible placements and offered Teel to get Student back into
         school.  Therefore, the District did not predetermine Student's placement at Teel.

14

15  ALJ Decision, p. 30.  Plaintiffs offer no evidence to contradict these findings.

16        Plaintiffs argue that the District predetermined Teel, because District refused to consider parental

17  input.  A parent has participated meaningfully in the development of the IEP when he or she is informed

18  of the child's needs, attends the IEP meeting, and has the opportunity to express disagreement with the

19  team's conclusions and request revisions to the IEP. *N.L. v. Knox County Schools*, 315 F.3d 688, 693-94

20  (6th Cir. 2003).  Here, Mother was very active in the IEP meetings, was aware of District's assessment

21  of Student's needs, and expressed disagreement with the team's conclusions.  After the August 2008 IEP

22  meeting and initial Teel offer, Mother visited Teel and then rejected the placement.  When Mother

23  demanded placement at Creekside, District staff and administrators contacted and consulted with

24  Creekside.  The minutes of the subsequent IEP meetings demonstrate that District did consider Mother's

25  request.[10]  Although parental involvement is a key to the IDEA, school personnel must only consider

26  parental input.  They are free to reject the parents' suggestions, however, and may come to offer their

27

28        [10] In addition to Teel and Creekside, the parties subsequently considered placement at Turlock Junior High School.
    District continued to offer Teel as the LRE placement during the relevant time period, while Mother never approved the offer.

own ideas so long as they keep an open mind. 34 C.F.R. §300.501(b)(3).  Based on the administrative record, Mother had an opportunity to be involved and to be heard in the process, even if her placement request was rejected by District.

In addition, this Court finds that Plaintiffs' further arguments related to predetermination of Teel placement do not establish that the placement was predetermined as a matter of law.  Plaintiffs contend that predetermination was established because District never evaluated Student at Creekside, never contacted any of Student's independent evaluators, and never offered a non-public agency to an IEP meeting.  These arguments do not establish that District failed to keep an open mind about placement. While District did not contact Student's independent evaluators, for example, District staff read and considered those evaluators' reports and discussed them at the appropriate IEP meetings.  The evidence supports the ALJ's conclusion that District kept an open mind.  Accordingly, the ALJ did not err to conclude that the District did not predetermine the Teel placement offer.

**7.     Whether the ALJ Erred Because the December 11, 2008 IEP Failed to Offer Appropriate Goals and Unilaterally Ceased Home Instruction**

**A.     Whether the December 11, 2008 IEP Offered Appropriate Goals**

Student criticizes the goals of the December 11, 2008 IEP, arguing that the goals for math, reading and language arts failed to offer clear baselines as to Student's abilities.  Student's math goals increased in difficulty.  As for the reading and language arts goals, they were a continuation of goals included in the April 2008 IEP, and included an additional goal for Student.  In addition, the continued goals were modified to address Student's needs.  As discussed more fully above, Ms. Post testified that appropriate goals require clear baselines so that all professionals will be able to understand the student's abilities and work with them effectively.  Ms. Post does not address the difficulty of assessing baselines for a student who has not had a district placement for as long as Student.  In addition, a review of the transcript of the December 11, 2008 IEP reflects the IEP team members' thoughtful approach to construct baselines for Student based on his unique circumstances and needs and the level of his abilities during the time that Mother home-instructed Student.  Moreover, this Court agrees that Student did not present sufficient evidence to establish that the proposed goals were inadequate to meet Student's unique needs.  Accordingly, Student fails to establish that the ALJ erred in concluding that the December 2008

43

1   IEP math, reading, and language arts goals denied Student a FAPE.

2         **B.**      **Whether the December 11, 2008 IEP Unilaterally Ceased Home Instruction**

3         On November 10, 2008, the parties agreed that District would provide Student with home-

4   hospital instruction on a temporary basis through November 24, 2008, which was later extended through

5   January 2009.  Ms. Gray provided home instruction to Student.  Student challenges District's decision

6   to cease home instruction.

7         Student argues that District unilaterally chose to cease home instruction without a valid basis.

8   Student argues further that in ceasing home instruction, District further denied Student a FAPE by failing

9   to implement Student's IEP.  District provided home instruction, because District intended for home

10  instruction to be a short-term bridge to transition Student back to a District placement.  In addition,

11  District argued that home instruction was based on a medical need that no longer existed.

12        The IDEA requires:

13        During the pendency of any proceedings conducted pursuant to [the IDEA], unless the
      State or local educational agency and the parents otherwise agree, the child shall remain

14        in the then-current educational placement of such child.

15  20 U.S.C. §1415(j).  This provision, commonly referred to as the "stay put" provision, "requires the

16  educational agency to maintain a disabled child's educational program until any placement dispute

17  between the agency and the child's parents is resolved." *Johnson v. Special Ed. Hearing Office,* 287 F.3d

18  1176, 1179 (9th Cir. 2002).

19        The ALJ did not err to conclude that Student's stay put placement was Sierra Vista, not home

20  instruction.  The stay put provision is an automatic stay in the "placement described in the child's most

21  recently implemented IEP." *Id*.  Home instruction was agreed upon as a temporary placement for a short

22  period of time during a time when Student was experiencing medical issues, but was not an agreed upon

23  permanent placement.  The parties had not agreed on a placement since the April 2008 IEP, which placed

24  Student at Sierra Vista.  Accordingly, home instruction was not the stay put placement for Student, and

25  Student fails to demonstrate that the ALJ's conclusion was erroneous as a matter of law.

26  **8.**      **Whether the ALJ Erred Because District Failed to Consider Information from Plaintiffs'**
      **Private Assessors**

27

28        The testimony of Mr. Hodge makes clear that District consistently made reports and other

1   information related to Student's private assessors available to IEP team members, and IEP team

2   members considered that information as part of the IEP meetings. AR at 4309.  As to the MIND Institute

3   reports, Mother gave those assessments to District a short time before the August 2008 IEP team

4   meeting.  While copies were distributed, they were not yet considered.  When District's IEP team

5   members had time to review the assessments, they considered and discussed them at the next IEP team

6   meeting.  Plaintiffs fail to establish that District refused to copy, distribute, and discuss any written

7   document provided to District by Mother by a private assessor.

8         Plaintiffs' arguments related to District's failure to invite the private assessors to the IEP

9   meetings lack merit.  District is not required to extend a personal invitation to Plaintiffs' private

10  assessors to attend the IEP meetings.  To provide adequate parental input, District is required to consider

11  the assessments.  As set forth above, however, the evidence demonstrates that District IEP team

12  members did read and discuss the private assessments.  Because the written assessments were available

13  to, and considered by District, Student has failed to establish that District's failure invite to the private

14  assessors to the IEP team meetings violated the IDEA.

15        Moreover, Plaintiffs fault District for failing to invite OT and speech specialists to the IEP

16  meetings.  As set forth above, Plaintiffs' prevailed on these issues in the ALJ Decision.  Accordingly,

17  Plaintiffs' motion as to this issue is denied as moot.

18  **9.      Whether the ALJ Erred Because the April 29, 2009 IEP Failed to Contain Appropriate
           Goals, Parents Were Unable to Participate Meaningfully, FAPE Placement Offer was
19         Predetermined and Parents were Prohibited From Viewing Creekside**

20        Plaintiffs challenge the April 2009 IEP for failing to include appropriate goals.  The April 2009

21  IEP contained goals similar to those of the December 2008 IEP.  Student had not attended school during

22  this time period.  The goals were written based on Student's Woodcock-Johnson II assessment, and were

23  aligned with standards.  Based on the circumstances, the ALJ did not err to conclude that the goals

24  included in the April 29, 2009 IEP provided Student a FAPE.

25        Plaintiffs further argue that District violated the IDEA because parents were denied the ability

26  to be equal participants in the IEP process.  As discussed more fully above, parental participation and

27  input are important aspects of the IDEA.

28        Plaintiffs contend that Mother was denied the ability to participate fully at the April 2009 IEP

45

because District counsel attended the meeting despite Mother's position that she was uncomfortable with counsel presence.  Plaintiffs point out that District counsel made several statements at the IEP.  Mother felt uncomfortable with the attorney's presence, and claims that she was not able to participate fully because of it.

Plaintiffs' claims are without merit.  Despite the option to cancel the meeting, Mother choose to participate in the April 2009 meeting.  This Court has read and reviewed the transcripts of that meeting.  Mother participated meaningfully and fully in that IEP meeting.  There is no indication that Mother was unable to participate fully.  The transcript reveals that Mother participated actively in assisting other team members with attempting to create baselines, developing goals, discussing placements, and other important aspects of the IEP.  Accordingly, summary adjudication on this issue is denied.

**Conclusion**

For the foregoing reasons, this Court DENIES Plaintiffs' summary judgment in full.

**DEFENDANTS' SUMMARY JUDGMENT MOTION**

In addition to Plaintiffs' IDEA appeal, Defendants move for summary adjudication in their favor on Plaintiffs' Fourth Amendment cause of action.  The Court shall consider Defendants' motion in this portion of this opinion.

**Standards of Review**

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial.  *Id*. at 322.  "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631.  The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial."  "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

### **Discussion**

Plaintiffs' Fourth Amendment cause of action is asserted against Mr. Briones and Mr. Hodge individually.  Plaintiffs allege that the acts and omissions of these defendants, "under color of law...deprived Plaintiff of his rights under the United States Constitution." Compl. ¶53.  Specifically, Plaintiffs allege that defendants deprived Student of his "constitutional right to be free from unreasonable government seizures...[b]y repeatedly using physical restraints on W.A. when they were not necessary or approved." Compl. ¶54.  Plaintiffs' Fourth Amendment claim is based, in part, on defendants alleged failure to "adhere to the Hughes Bill requirements for use of restraints." *Id*.

Defendants challenge Plaintiffs' Fourth Amendment claim on two grounds.  First, defendants

argue that Plaintiffs' fail to establish this claim as a matter of law, as there is no evidence to support a

constitutional violation of Student's Fourth Amendment right.  Second, defendants contend that this

claim is barred by the doctrine of qualified immunity.  Because defendants' second argument would bar

this claim, if successful, the Court considers it first.

### Whether Defendants are Entitled to Qualified Immunity

Defendants argue that Plaintiffs' Fourth Amendment claim is barred because they enjoy qualified

immunity.  Qualified immunity protects Section 1983 defendants "from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." *Tibbets v. Kulongoski,* 567 F.3d 529, 535 (9th Cir. 2009),

quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The "heart of qualified immunity is that it

spares the defendant from having to go forward with an inquiry into the merits of the case.  Instead, the

threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be is true, any allegedly

violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).  The issue of

qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019

(1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991).

"In analyzing whether School Officials are entitled to qualified immunity," the Court addresses

two questions. *Preschooler II v. Clark County Sch. Bd. of Trs*., 479 F.3d 1175, 1179 (9th Cir. 2007).

First, the Court considers, "taken in a light most favorable to the party asserting the injury, the party has

established a violation of a federal right." *Id.*  If this "threshold inquiry is satisfied," the Court next

considers "whether the School Officials' conduct violated 'clearly established statutory or constitutional

rights of which a reasonable person would have known." *Id*.  "The judges of the district courts and the

courts of appeals should be permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." *Pearson v. Callahan*, 555 U.S.223, 129 S.Ct. 808, 818 (2009).  In discussing

*Pearson*, the Ninth Circuit Court of Appeals explained that "lower courts are no longer required to

consider whether a constitutional violation occurred before considering whether the right in question was

'clearly established.'" *Moss v. U.S. Secret Service*, 572 F.3d 962, 968 n. 5 (9th Cir. 2009).

///

*Clearly Established Right*

The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent.*" Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987). "The question is what the officer reasonably understood his powers and responsibilities to be, when he acted under clearly established standards." *Saucier v. Katz*, 533 U.S. 194, 208, 121 S.Ct. 2151 (2001).

"To determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003), *cert. denied*, 543 U.S. 825, 125 S.Ct. 43 (2004). "Rather, the 'standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity.'" *Serrano*, 345 F.3d at 1077 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002).

"[T]he right of a student to be free from excessive force at the hands of teachers employed by the state was clearly established as early as 1990." *Preschooler II.*, 479 F.3d at 1178 (quoting *Doe v. State of Hawaii Dep't of Educ.*, 334 F.3d 906, 910 (9th Cir. 2003)). Because of this clearly established federal right, this Court moves to the second prong of this inquiry.

*Violation of Federal Right*

Next, the Court considers whether the conduct rises to the level of a violation of Student's Fourth Amendment right to be free from unreasonable seizures by the school officials. "[E]xcess force by a [school official] against a student violate[s] the student's constitutional rights." *P.B. v. Koch*, 96 F.3d 1298, 1302-03 (9th Cir. 1996). "The consequences of a teacher's force against a student at school are generally analyzed under the 'reasonableness rubric of the Fourth Amendment[.]" *Preschooler II*, 479 F.3d at 1180. The Court determines "reasonableness" by "careful[ly] balancing...the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotes omitted).

In the school context, the reasonableness of a seizure must be considered in light of the

educational objectives trying to be achieved. *Doe v. State of Hawaii Dep't of Ed.*, 334 F.3d 906, 909 (9th Cir. 2003).  Whether the use of force by a teacher is a constitutional violation is analyzed under the "reasonableness" rubric of the Fourth Amendment. *Id.* at 908-09. In its evaluation, the Court must "look objectively at the specific circumstances of the school and child." *Preschooler II*, 479 F.3d at 1181.  The Court considers the reasonableness of the  school official's actions "in light of the age and sex of the student and the nature of the infraction." *Id*.

To consider the reasonableness of the use of restraints, the Court considers the type of restraints used, the circumstances surrounded the use of restraints, and the specific circumstances of the school and child.

*Types of Restraints Used*

Staff used district-approved restraints, utilizing ARM strategies.  According to the BSP, then BIP, District staff would first attempt to de-escalate Student when he presented with maladaptive behavior.  If those strategies were ineffective, and as a last resort, District staff would perform a restraint on Student.  Different types of holds were utilized, including: (1) basket hold (one-person or two-person); (2) wall containment; and (3) prone containment (two-person, three-person, or four-person).

Ms. Briones described a basket hold as follows: "[Y]ou have to take their arms and they're kind of like crisscrossed underneath them and you hold, basically, in the middle of their arms, and you make so that their [sic] unable to move, basically, so they cannot hit, until they're calm." AR at 2684.

A prone containment utilizes two people who place the student on the floor.  The people restraining the child place hands and legs are put in specific places to prevent injury to the student.  One hand is placed on the shoulder of the student, while the other hand is placed on the student's forearm. A foot is placed on the inside of the middle of the student's calf and the rest of the leg would be out. When the student is the on ground, the arms would be out to the side and one of the restrainer's hands is placed on the shoulder blade.

According to Ms. Briones, describing the times when restraints were used on Student, "pretty much it always turned into a prone containment...because he was so strong." AR at 2662.  Ms. Briones further explained that if her report did not indicate specifically a "basket hold, it is fair to assume that it was a prone containment." AR at 2690.

*Circumstances When Student was Restrained*

Student became aggressive with staff and other students in the classroom before he was restrained.

On December 17, 2007, Student was having behavioral problems in the classroom.   Ms. Ledezma, Student's aide, claims that she was following the BSP to address the behavior problems, but Student continued to escalate.   Student began hitting staff with each event that took place.   A restraint was used on Student.

On January 8, 2008, staff performed "basket holds" on Student.   Between 1 p.m. and 2 p.m. on that day, there were three separate, similar incidents.   Staff made a request or demand, Student did not want to do the task, and Student hit staff as a result.   On the third event, Student was restrained.   According to Ms. Briones, it was "more than likely a prone containment." Id.

Student was put in a basket hold twice on January 9, 2008.   A third event occurred, but the timer stopped.

On January 10, 2008, Student was hitting staff, hitting other students, and was off task.   The antecedents to the behaviors were "for the most part, making a demand or request upon him." AR at 2686.   The demands or requests were to complete work, "always something academically-related." *Id*. According to Ms. Briones, no holds were performed on January 10, 2008.   Instead, Student was told "no."   Paperwork filled out by Ms. Briones indicates that a restraint may have been used this day.

A hold was performed on Student on January 29, 2008.   Student was not coming to school at this time, but was brought to school for the purpose of Ms. Simpson's FAA.   Ms. Briones was "not involved" with the hold.   AR at 2696.   She believes that staff started with a "wall hold" but ended up in a prone containment on the floor.   Father was present.   Ms. Briones wrote the report.   AR at 2697.   It appears that Student started to become aggressive before he was restrained.

*Specific Circumstances of Student*

Student has autism.   The record establishes that Student has a history of becoming aggressive in the classroom, particularly at Apricot Valley.   Student was aggressive on the second day of school without restraint.   Student pinched another student.   Student's maladaptive behaviors, including cursing, hitting, swatting, and pinching began to escalate in the December 2007 and January 2008.   During this

1   time, Student was undergoing a transition in his medication.

2        Student experienced medical issues.  Because of these issues, Plaintiffs argue that Student was

3   weak.  District staff who encountered Student's aggressive behaviors, however, unanimously indicated

4   that multiple people were required to restrain Student because of his strength.

5                                    *Specific Circumstances of School*

6        Student was attending a special day classroom that was populated with other students who had

7   disabilities and special needs.  Immediately preceding the restraints, Student's maladaptive behavior

8   escalated and he hit staff members or other students.

9                                              *Discussion*

10       Defendants argue that nothing in the voluminous administrative record supports Plaintiffs' claim

11  that excessive force was against Student.  Defendants contend that the record establishes that Ms.

12  Briones and her staff were ARM trained prior to applying restraints to Student.  Defendants further

13  contend that ARM training is a SELPA-approved response to assaultive behavior.  See 5 CCR

14  §3052(i)(2).  Further, defendants contend that the record establishes that ARM training meets the legal

15  requirements for the Hughes Bill and other legal requirements regarding restraints.  Defendants further

16  point out that Plaintiffs agreed to the use of restraints at the November 2007 IEP and understood that

17  restraints would be used if necessary.

18       Moreover, defendants argue that the use of restraints was reasonable because "state law explicitly

19  allows school officials to physically restrain students when the student poses an immediate danger to

20  himself or others." *Alex G. v. Bd. of Trs.*, 387 F. Supp. 2d. 1119, 1125 (E.D. Cal. 2005) (citing Cal. Code

21  Regs. Tit. 5 §3052(I)).  California law permits the use of restraints in special education programs in case

22  of an emergency. 5 C.C.R. § 3052(i) provides:

> **Emergency Interventions**. Emergency interventions may only be used to control
> unpredictable, spontaneous behavior which poses clear and present danger of serious
> physical harm to the individual or others and which cannot be immediately prevented by
> a response less restrictive than the temporary application of a technique used to contain
> the behavior.
> (1) Emergency interventions shall not be used as a substitute for the systematic
> behavioral intervention plan that is designed to change, replace, modify, or eliminate a
> targeted behavior.
>
> (2) Whenever a behavioral emergency occurs, only behavioral emergency interventions
> approved by the special education local planning area (SELPA) may be used.

52

(3) No emergency intervention shall be employed for longer than is necessary to contain the behavior. Any situation which requires prolonged use of an emergency intervention shall require staff to seek assistance of the school site administrator or law enforcement agency, as applicable to the situation.

(4) Emergency interventions may not include:

(A) Locked seclusion, unless it is in a facility otherwise licensed or permitted by state law to use a locked room;

(B) Employment of a device or material or objects which simultaneously immobilize all four extremities, except that techniques such as prone containment may be used as an emergency intervention by staff trained in such procedures; and

(C) An amount of force that exceeds that which is reasonable and necessary under the circumstances.

Defendants contend that because Student posed a threat to staff and other students, and state law authorizes the use of restraints under these circumstances, the performance of physical restraints were reasonable under the circumstances.

The evidence in the administrative record established that at the time restraints were used against Student, he posed a risk to himself, staff, or other students. Restraints were used by staff members who were trained according to District-approved standards. State law permits the use of restraints under these circumstances. Accordingly, this Court agrees with the Court in *Alex G.*, which opined:

As an initial matter, it is unclear that the District's actions violated any law, given that state law explicitly allows school officials to physically restrain students when the student poses an immediate danger to himself or others.

387 F. Supp. 2d at 1125. Because District staff was authorized to restrain Student when he became aggressive, and the evidence establishes that Student became aggressive towards staff and students before he was restrained, Plaintiffs fail to establish that Defendants violated a clearly established right.

Plaintiffs oppose this motion on a number of grounds. Plaintiffs contend that Ms. Ledezma and Ms. Briones were unable to follow the BSP, because they were unable to spot frustrations before they escalated and were unable to redirect Student before intrusive restraints were used. Plaintiffs assert that the District-approved ARM restraints violated the Hughes Bill, arguing that District must use ABA-approved restraints. Plaintiffs continue to assert that District staff violated the Hughes Bill by failing to follow the Hughes Bill's procedural requirements. Plaintiffs conclude that a reasonable trier of fact could conclude that Ms. Briones unreasonably restrained Student under the circumstances based on the

1   frequency of the restraints.

2        As Defendants' correctly point out, Plaintiffs fail to discuss the circumstances surrounding each

3   of the restraints that are the subject of this Fourth Amendment claim.  Plaintiffs further fail to discuss

4   the reasonableness of each of the restraints used under the circumstances.  Plaintiffs' reasonableness

5   argument based on the frequency of the use of restraints ignores the relevant inquiry–that is, the

6   circumstances surrounding the type of restraint, the school, the child, and the circumstances at the time

7   the restraint was used.  As such, Plaintiffs fail to oppose meaningfully this motion.

8        As set forth above, this Court must consider the circumstances surrounding each restraint to

9   determine whether the restraint was reasonable or a clear violation of Student's right.  The restraints used

10  to de-escalate Student's maladaptive behaviors of hitting, kicking, and swatting staff and students were

11  reasonable under the circumstances.  Defendants have established that each time Student was restrained,

12  he was restrained because Student poses a serious threat of harm to the safety of himself, staff, or other

13  students.  Moreover, the restraints used were based on specific restraint techniques, approved by the

14  District.  Under these circumstances, this Court finds that defendants are entitled to qualified immunity.

15  Accordingly, Plaintiffs' Fourth Amendment claim is barred.

16                              **<u>CONCLUSION AND ORDER</u>**

17       For the reasons discussed above, this Court DENIES Plaintiffs' summary judgment motion

18  and GRANTS Defendants' summary judgment motion.  The clerk of court is DIRECTED to enter

19  judgment in favor of Defendants and against Plaintiffs.

20  IT IS SO ORDERED.

21  **Dated:    July 15, 2011**                **/s/ Lawrence J. O'Neill**
                                              UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                                        54